CINERGY CORP., Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 99–750T, 00–572T.

United States Court of Federal Claims.

March 10, 2003.

---

Virginia Withers Powell, Hunton & Williams, Richmond, Virginia, attorney of record for plaintiff.

Benjamin C. King, Jr., U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Eileen J. O'Connor, for defendant.

## OPINION

ALLEGRA, Judge.

This tax refund suit is brought by Cinergy Corporation (Cinergy or plaintiff) to recover taxes paid by PSI Resources, a wholly owned subsidiary, and is before the court following a trial in Washington, D.C. Three distinct issues—all apparently with industry-wide significance—are presented. To resolve them, the court must explore the intersection of the complex worlds of Federal income taxation and public utility regulation. On this journey, the court's task is to follow the statutory map drawn by the Congressional cartographers, otherwise known as the Internal Revenue Code. That map is dotted with distinctive definitional markers and contour lines. Onto it, the court must overlay a transparency of the facts *sub judice* to determine whether there is a matching that reveals plaintiff is entitled to the tax benefits it seeks. As the ancient Chinese proverb goes, "a journey of a thousand miles begins with a single step"—here to render preliminary fact findings based upon the trial record.

## I. STATEMENT OF FACTS

Cinergy, a corporation organized under the laws of Delaware, is the successor in interest to PSI Resources, as a result of the merger of PSI Resources with and into Cinergy on October 24, 1994. PSI Resources (then called PSI Holdings, Inc.) was formed on or about June 1, 1988. From June 1, 1988 until the merger, PSI Resources owned all of the outstanding common stock of Public Service Company of Indiana, Inc. ("PSI"). From its formation through October 24, 1994, PSI Resources was the parent of an affiliated group of corporations, including PSI, that filed consolidated federal income tax returns. PSI is a public utility, organized under the laws of the state of Indiana, that produced, transmitted, and distributed electricity to customers in Indiana. PSI was subject to regulation by the Indiana Utility Regulatory Commission ("IURC") and the Federal Energy Regulato-

ry Commission ("FERC") (collectively referred to as the "Regulatory Authorities").

PSI seeks three tax benefits in this suit. First, it asserts that it is entitled to compute its income tax liability for 1988 and 1989 in accordance with the "claim of right" provisions of section 1341 of the Internal Revenue Code of 1986 (26 U.S.C.). Second, it argues that, for the years in question, it may exclude from its taxable income fuel cost overrecoveries that it was obliged to return to its customers pursuant to orders of the Regulatory Authorities. Finally, it contends that it has the right to deduct, under section 162 of the Code, the cost of removing and encapsulating asbestos material in one of its office buildings in Plainfield, Indiana.

After carefully reviewing the evidence received at the trial, including the stipulation of facts filed by the parties, this court makes the following factual findings with respect to these issues.

### A. Section 1341 Issue

The IURC and FERC regulated PSI's rates and charges to its retail and wholesale customers, respectively. In calculating these rates, the Regulatory Authorities factored in the revenue requirements of the company, reflecting its "costs of service"—a component that included its tax liabilities—as well as a return on capital. For ratemaking purposes, PSI's projections of federal income taxes were further subdivided into two compo-

nents: "current" and "deferred" taxes. "Current" taxes for a given year represented the amount of federal income tax that PSI expected to pay on its projected revenue amounts for that year. By comparison, "deferred" taxes consisted of estimated taxes to be paid in the future either with respect to: (i) income received in a current year that would be deferred for income tax purposes to a later year; or (ii) deductions in later years that would be accelerated into a current year (*e.g.*, accelerated depreciation of assets). In effect, the portion of the rates associated with such deferred taxes were included in the company's structure like the proceeds of an interest free loan, thereby benefitting not only the company but its customers, who through this convention ultimately received lower rates.[1] During the period 1973–1988, PSI, as authorized by the Regulatory Authorities, collected from its customers amounts to cover these deferred taxes and segregated them in a deferred taxes account, until needed.

In 1984, PSI was forced to terminate the construction of its Marble Hill Nuclear Generating Station, which it had been constructing for several years. PSI was concerned that this project's termination would frighten away investors, leaving the company in financial straits, with little liquidity and unable to attract additional capital. To minimize this harm, on January 16, 1984, the same day the plant was cancelled, PSI filed a petition with

---

1. In *Fla. Progress Corp. v. Comm'r*, 114 T.C. 587, 2000 WL 889750 (2000), the Tax Court provided an excellent description of how deferred income tax accounts work:

> The Federal income tax expense that [a utility] uses in determining its costs of providing future services for rate-making purposes is generally different from the Federal income tax expense that it currently owes to the Government. This difference is attributable to timing differences in recognition of items of income and expense. For example, [regulatory authorities] allow [a utility] to use straight-line depreciation for rate-making purposes, while accelerated depreciation is used for determining current taxable income. In an earlier year when accelerated depreciation is greater than straight-line depreciation, this timing difference causes a utility to collect a higher Federal income tax component for rate-making purposes than the income taxes currently owed to the Government for that year. This excess of

the estimated Federal income tax expense is referred to as "deferred Federal income tax expense." In a subsequent year when the timing differences reverse, the income tax component that the utility charges yields collections that are less than the Federal income taxes owed by the utility. The utility uses the amounts that it overcollects in earlier years to pay the taxes owed in later years.

> ... If the income tax rate remains constant, the deferred income tax account will zero out once the timing differences between rate-making income and taxable income expire.

*Id.*, 114 T.C. at 589–90. At trial, Mr. Charles Winger, previously PSI's comptroller, similarly testified that "[t]he difference between those deductions for tax purposes and the tax return and those deductions that are reflected as tax expenses on the company's books and in rates, there is a deferred tax provided on those and it is reflected in the deferred tax reserve of the company as a liability."

the IURC seeking a 14 percent interim emergency rate increase to alleviate its financial difficulties. Though the petition was initially opposed by various consumer groups, PSI and these groups eventually agreed to a five percent increase in interim emergency revenue, to be collected in calendar year 1983. The IURC approved this settlement on March 8, 1984. On May 25, 1984, PSI then filed with the IURC a petition for a permanent rate increase, as well as permission to amortize its terminated investment in Marble Hill (essentially allowing it to recover the costs of that project over time). This petition again met stiff opposition. After much debate, on March 7, 1986, the IURC approved an additional rate increase of 8.2 percent to address PSI's continuing financial difficulties. The order established temporary, non-refundable rates that were to remain in effect until December 31, 1989, or until otherwise ordered, and assured that those rates would not be adjusted if federal or state income tax rates decreased in the 1986–89 time period.[2] Pursuant to the 1986 order, PSI also discontinued the payment of a common dividend to shareholders, which, combined with the emergency rate relief, allowed it to pay down its debt and improve its financial situation.

By late 1987, PSI's financial and operating condition, indeed, had improved. On October 26, 1987, several PSI customers filed a petition with the IURC seeking an investigation into whether PSI was still in an emergency situation, with an eye toward reducing PSI's rates to reflect its meliorated condition. PSI, however, felt that its emergency had not passed, making the proposed rate reductions premature. More specifically, it was concerned that a rate reduction would impair its financial recovery because the corresponding reduction in its operating income would require it to write off a larger portion of the regulatory asset related to the Marble Hill plant, negatively impacting its equity. Attempting to take the initiative, PSI filed its own petition with the IURC on January 20, 1988, which it amended on March 7, 1988.[3] The amended petition proposed that, subject to confirming with the Internal Revenue Service that the transaction would not violate the so-called normalization provisions of section 167(1) of the Code and section 203(e) of the Tax Reform Act of 1986,[4] the March 7, 1986, Order would be modified as follows:

> Upon receipt of the necessary confirmations and approvals, the temporary non-refundable emergency rates authorized for Petitioner shall be reduced in two steps by an amount sufficient to reflect in rates the accelerated reversal of certain deferred income taxes estimated to be $72 million, during the period prior to January 1, 1990. The resulting reduction in Petitioner's retail revenues is estimated to be $131 million. Assuming receipt of necessary approvals by May 1, 1988, the first step of such revenue reductions would result in a retail rate decrease of approximately 5.94% ... Assuming receipt of necessary approvals by July 1, 1988, the second step of such revenue reductions would result in a retail rate decrease of approximately 3.23% ....

The amended petition further provided that "[s]uch rate reduction shall be distributed to the various classes of Petitioner's retail electric ratepayers on the basis of the allocated rate base determined in the March 7, 1986 Order." Finally, it provided that if the IRS determined that the proposed accelerated reversal of the deferred income taxes violated

---

**2.** These and other steps taken by the IURC were required by the Securities and Exchange Commission, as well as PSI's outside auditing firm, as preconditions to allowing PSI to record as an asset the future tax benefits that would accrue from the net operating losses associated with the write off of Marble Hill for tax purposes. The conditions were designed to assure that PSI would have rate income against which to apply those net operating losses.

**3.** According to PSI officials, these petitions were filed "in order to permit the company to reduce its retail electric rates 20 months early and in a manner that would not impair the company's ability to obtain the financial restructuring objectives set forth in that order."

**4.** Under the normalization method of tax accounting, consumer rates are calculated as if the normal tax burden had been paid. The difference between taxes actually paid and that which is recorded as paid for rate purposes is placed in a reserve fund to pay the heavier future burden.

the normalization rules, "then the proposed reduction in Petitioner's electric rates shall be limited to that amount due to the accelerated reversal of certain deferred income taxes that does not violate such normalization requirements."

The IURC had two proceedings to consider the competing proposals: the first to determine whether there still was an emergency financial situation for the company and to investigate the appropriate rates for the company, and the second to review PSI's proposed "refund" of deferred taxes. At the hearings, the Office of Utility Consumer Counselor (UCC) supported PSI's proposal, but recommended that it be considered the first step of a broader plan to reduce rates by 13.2 percent, plus a one-time $50 million cash payment to ratepayers. Following further settlement discussions, PSI, the UCC, and Industrial Energy Consumers reached an agreement, pursuant to which, on May 9, 1988, they submitted a joint proposed order providing that: (i) PSI would reduce its rates by 6 percent on July 1, 1988, and an additional 3 percent on July 1, 1988; (ii) reduce its rates an additional 4.2 percent beginning on October 1, 1989; and (iii) make a $50 million cash payment to its customers in September 1988. The rate reductions proposed in this joint order equaled 13.2 percent—the same percentage increase received by PSI in the 1984 and 1986 emergency orders. The proposal stated that the rate reductions and cash payments would be applied first as an accelerated reversal of deferred income taxes until those taxes were fully eliminated, "a unique event occasioned by the peculiar emergency condition of PSI." [5]

The staff of the IURC independently analyzed the PSI proposal, concluding that there was no real rate reduction because future customers would be required to pay higher rates in order for PSI to pay for taxes that otherwise would have been funded from the deferred taxes account—as explained by Mr. Winger, "[t]hey basically took the position

that this was nothing more than the reallocation of tax expense between current customers and future customers." They noted that a "true" rate reduction would lower the earnings and common equity of the company—of course, this was exactly what PSI wanted to avoid. Overall, the staff urged the IURC to reject the settlement proposal.

Overruling these objections, on June 1, 1988, the IURC adopted the settlement proposal, ordering that "[t]he reductions in PSI's retail electric rates and the $50 million cash payment ... should first be applied as an accelerated reversal of the deferred income taxes identified ... until the $72 million balance of such deferred income taxes has been fully eliminated." The IURC found that although it had historically recognized that the normalization method was the proper method of accounting for timing differences, "traditional ratemaking principles do not strictly apply to PSI's unique, emergency situation." It further found that while PSI's financial condition had improved since 1986, it had not yet achieved the degree of financial recovery contemplated in that year. In this regard, the IURC observed that PSI's common stock equity was only 22 percent of total capitalization (about half that of most other utility companies and the lowest in the industry) and that PSI's senior securities were still rated either below investment grade or at the lowest investment grade by various rating agencies. The IURC, nonetheless, found that a rate reduction was warranted, but that an accelerated reversal of deferred income taxes would instead be employed to protect regulatory assets and continue rebuilding PSI's common equity to a level that would enable the IURC to establish permanent rates.

To effectuate these views, the IURC ordered PSI to return its customers a total of $134.4 million, which represented the amount that PSI's customers previously had paid to PSI to fund certain of PSI's deferred taxes. [6]

---

5. At trial, Mr. Winger defined accelerated reversal as meaning that PSI paid an amount much more quickly than it would have otherwise flowed back to customers through rates to reduce the liability for deferred income taxes as those taxes became due and payable. He also testified that, in his view, such an "accelerated reversal" was equivalent to a return or a refund to customers.

6. At trial, Mr. Winger explained that PSI could not "refund" the "protected" portion of deferred taxes which related to accelerated deductions for

Rate reductions were to be distributed to the various classes of PSI's retail electric rate-payers in proportion to the allocated rate base of each class determined in the March 1986 Order. The rate reductions, however, were not separately itemized in any of the bills. Consistent with the IURC's order, on September 1, 1988, PSI wrote checks to customers totaling $50,013,000 for the return of deferred taxes back to customers. It returned the additional $84.4 million of deferred taxes to customers over a 12–month period ending June 30, 1989. The cash payments were made to current customers, *i.e.*, not necessarily those who had originally contributed to the deferred tax fund in prior years.[7]

Following the order, PSI reached a settlement with various wholesale customers for a reduction of rates, first applying the accelerated reversal of deferred income taxes that were associated with or applicable to wholesale customers. On October 12, 1988, FERC effectively approved, by noticing, the proposed "two-step rate decrease applicable to 26 wholesale customers." As a result of that settlement agreement, beginning in September 1988, PSI offset rates through September 30, 1990, to pay the deferred taxes of $8,395,500 to customers.

PSI filed a consolidated federal income tax return for 1988 on September 15, 1989, and for 1989, on September 17, 1990 (after 1989, PSI changed its name to PSI Energy, Inc., its current name). On September 15, 1992, PSI filed an amended U.S. corporation income tax return (Form 1120X) for its 1988 and 1989 tax years, requesting refunds of $17,019,171 and $7,923,772, respectively. PSI claimed that it was entitled to treat the "refunds" in 1988 and 1989 in accordance with section 1341 of the Code. On September

8, 1997, the IRS disallowed these claims and Cinergy subsequently filed suit in this court.

## B.   Fuel Cost Overrecoveries

In its second claim, PSI seeks to exclude from its gross income for the years in question overrecoveries of fuel costs received from its ratepayers; alternatively, it claims a deduction under section 162 of the Code for overrecoveries that were refunded to customers.

Fuel cost is the largest single component of PSI's cost of service, making up approximately 30 percent of the total. Under a rate structure in place since the mid–1970s, costs of fuel were included in PSI's base rates, which were set by the IURC every two or three years. However, because PSI's actual fuel costs fluctuated, sometimes, severely, the IURC authorized it to adjust its rates quarterly though a Fuel Cost Adjustment Clause (FAC) proceeding. Prior to 1975, PSI employed this mechanism to recover fuel costs only for wholesale, industrial, and commercial customers; but, on March 24, 1976, following action by the state legislature, the IURC adopted a version of the FAC for retail customers. The 1976 order indicated that, in light of the then volatile fluctuations in fuel costs, changes in the FAC process were being made to increase the accuracy of the FACs and to reduce the lag between a change in fuel cost to the utility and its being reflected on a customer's bill.[8]

During the years in question, PSI's FAC had two components: the first was designed to recover PSI's projected fuel cost for an upcoming billing period, while the second was designed to correct for differences between how past projected fuel costs had com-

depreciation. Rather, PSI returned the unprotected portion of deferred taxes which related to things such as basis differences in property between book and tax value.

7.   In explaining why PSI did not pay back the deferred taxes to the customers who had paid them, Mr. Winger testified—"it would be difficult, if not impossible, to be able to track all of those customers that might have been those that paid in these deferred taxes ... Customers come, customers go, so as a practical matter when refunds of this nature get made, it's generally to

current customers, not trying to get back to identify individual customers."

8.   The IURC order indicated that "[w]hile some lag, especially if one is to anticipate that the long run trend of fuel costs will be upward, is beneficial to the public interest in the respect that it provides an incentive for utilities to obtain fuel at the lowest possible price and thereby reduce the amount of non-recoverable increase in cost, an unreasonably long lag has the effect of mismatching the expenses and revenues with respect to fuel costs and defeats the purpose of the FAC."

pared to actual costs. To calculate this second factor, PSI was required to reconcile its estimated fuel costs with its actual fuel costs on a monthly basis. If the estimated fuel costs for a particular month were less than the actual fuel costs, a fuel cost "underrecovery" resulted, which the IURC allowed PSI to recover by increasing the FAC in a succeeding quarter. On the other hand, if the estimated fuel costs for a particular month were greater than the actual fuel costs, a fuel cost "overrecovery" resulted, which the IURC required PSI to return to its ratepayers by decreasing the FAC in a succeeding quarter.

The March 24, 1976, order establishing this process adopted a somewhat complicated formula for calculating the fuel adjustment factor.[9] Regarding the monthly impact of the reconciliation process, the order provided that "[t]he Adjustment Factor shall be further modified commencing with the fourth succeeding calendar or billing cycle month to reflect the difference between incremental fuel cost billed and the incremental fuel cost actually experienced during the first month of the estimated period." Burnishing this reconciliation requirement and placing it in the context of the new FAC, the order stated—

> In order to improve the accuracy of the FACs and to decrease the lag in reflecting changes in the FAC so as not to be unreasonable, a clause should be adopted that permits the generating utilities to forecast fuel costs for a period of three months, and to reflect such estimated average cost in the change applied for pursuant to their FAC. As actual monthly costs become available, any difference between the estimated incremental fuel costs billed and the

incremental fuel costs actually incurred would be reconciled monthly and reflected in succeeding applications for change in FAC cost factors to be applied to bills rendered in the next billing period following approval of the change. This continuous reconciliation of estimated incremental fuel costs billed with actual incremental fuel costs incurred would more closely match expenses to revenues, but would still provide sufficient incentive to generating utilities through the remaining unavoidable lag and resulting unrecoverable expenses . . . to obtain fuel at the lowest possible cost.

Under the order, the FAC was revised based on applications submitted by PSI to the IURC quarterly, so that each application reflected the impact of three months worth of reconciliations. Due to the nature of these filings and the timing of the IURC's approval process for the FAC application, PSI reconciled the difference between estimated and actual fuel costs for a particular month approximately six months after such month (*e.g.*, for January the reconciliation occurred in July). As a result of this delay, reconciliations for January through May of a given year were made during the same taxable year; while reconciliations for June through December of a year were made in the following taxable year.[10] The IURC neither required PSI to pay interest on fuel cost overrecoveries nor permitted PSI to charge interest on fuel cost underrecoveries.

The process adopted by FERC for PSI's wholesale customers was similar except that any difference between estimated and actual fuel costs for a particular month were reconciled in the following month. Thus, by the

---

9. This formula was algebraically depicted as follows:

**Adjustment Factor = (F/S)—Base Cost**

"F" generally was the estimated expense of fuel based on a three month average cost beginning with the month immediately following either the current calendar month or the current billing cycle month; "S" generally was the estimated kilowatt-hour sales for the same estimated period set forth in "F"; and the "Base Cost" generally was the base costs of fuel set forth in the utility's FAC previously in effect. The order provided further instructions, not herein relevant, for adjusting these quantities.

10. Michael Farmer, PSI's Revenue Requirements Manager during the years in question, testified that in return for the right to recover current fuel costs, PSI was required to show that it had acquired fuel at the least cost possible, dispatched its system on a least cost basis, not exceeded the earnings cap set by the IURC, and that any decreases in fuel costs had not offset increases in operation and maintenance expense. Based on the existence of such requirements, Mr. Farmer testified that the FAC was the result of a "regulatory compact."

end of its taxable year, PSI had effectuated such reconciliations for all months except December. Individual modifications to the wholesale FAC, however, were not reviewed and approved by FERC, even in a summary proceeding, but instead were subjected to periodic audits.

For federal income tax purposes, PSI did not include in its taxable income any fuel cost overrecoveries, nor did it claim a deduction when it repaid such overrecoveries. PSI did not include in its income the amount of any fuel cost underrecoveries until it charged those amounts to its customers. By comparison, for both under- and overrecoveries, PSI deducted its actual expenses incurred for fuel costs.[11] For 1989, PSI had outstanding at the end of the year the following fuel cost overrecoveries: (i) $606,420 with respect to PSI's retail customers for June 1989 and (ii) $153,598 for its wholesale customers for December 1989. For 1990, PSI had outstanding at the end of its taxable year the following fuel cost overrecoveries: (i) $584,449 with respect to PSI's retail customers for June 1990; (ii) $502,590 with respect to its retail customers for July 1990; (iii) $650,186 with respect to its retail customers for August 1990; and (iv) $952,822 with respect to its retail customers for September 1990. At the end of 1990, there were no outstanding fuel cost overrecoveries for PSI's wholesale customers.

PSI sought a tax refund for 1989 and 1990 based on excluding from its income fuel cost overrecoveries totaling $760,018 for 1989 and $2,690,047 for 1990. The IRS, however, only allowed PSI a deduction of $760,018 for 1990 based on PSI's repayment in 1990 of its 1989 overrecoveries.

## C. Costs for Removing and Encapsulating Asbestos

In its third claim, PSI seeks to recover costs incurred in removing and encapsulating asbestos in one of its office buildings in Plainfield, Indiana. An addition to that office building was completed in 1972 (the 1972 addition), three levels of which contained fireproofing material that consisted, in part, of asbestos fibers sprayed onto the steel structure. Environmental policies and building standards then in place did not restrict the use of such material. When the fireproofing material was originally sprayed on the structure, it was stiff and essentially encased the asbestos. In the late 1980s, however, PSI discovered that the asbestos material had become friable—it was flaking off and would particularly crumble if bumped or disturbed. While air concentration samples indicated that asbestos levels were significantly below what the Occupational Safety and Health Administration viewed as hazardous, PSI, nonetheless, became concerned that maintenance personnel might be exposed to the asbestos while working around the ceilings or that the circulation of air in the office space eventually would contain hazardous levels of friable asbestos.

PSI resolved to treat the asbestos, to prevent further deterioration and eliminate any risk of exposure. In 1989, it retained Centin Corporation ("Centin") to remove or encapsulate the asbestos-containing materials on the basement, first, and second levels of the 1972 addition. The project, which began on or about March 12, 1990, and ended on or about October 14, 1990, included: removal and disposal of the existing drop ceiling in the basement; removal and disposal of the sprayed on fireproofing material from certain areas; removal and disposal of pipe fittings encountered during the project that contained asbestos and replacement thereof with non-asbestos fittings; and encapsulation of some of the existing fireproofing in the basement. Centin was paid $824,181 for these services, as well as the installation of some

---

11. In a general example of the FAC analyzed by both Mr. Farmer and Mr. Barrett, if fuel costs were $1000 and fuel revenues or FAC billings were $900 for a given month, then PSI would record revenues of $900 with a fuel expense of $1000, but provide a credit to fuel expense (recognizing that $100 would be collected in the future). For tax purposes, the fuel costs of $1000 would be deducted, and FAC billings (or fuel revenues) would be included as revenue on the tax return, yielding a tax income for the month of a loss of $100. For a second month, if fuel costs were $1000 and fuel revenues were $1100, PSI would record revenues of $1100 and for fuel expense, record $1000 with another $100 of fuel expense to show the future refund to customers. Taxable income for that month would be $100.

new non-asbestos fire-proofing material.[12] After the asbestos was removed, a new sprinkler system was installed in the basement area to compensate for the loss of the fire-proofing material and keep the building up to local fire codes.

The work performed by Centin was neither prompted by any intent to sell the building nor related to any negotiations associated with such a sale. It also was not part of a broader program to refurbish the building.[13] Rather, PSI used the 1972 addition both before and after the asbestos work was performed. Further, the parties have stipulated that the asbestos work did not extend the useful life of the 1972 addition.

Cinergy claims that these removal and encapsulation costs were ordinary and necessary business expenses that did not add to the value or the life of the building and that, therefore, they should be deductible under section 162 of the Code. The amount of tax at issue here is allegedly $279,018.

\*    \*    \*    \*    \*    \*

To summarize, on September 7, 1999, Cinergy filed suit in this court seeking: (i) as to the 1988 and 1989 rate adjustment, the refund of federal income taxes assessed against PSI in the amount of $17,019,171 for 1988 and $7,923,772 for 1989; (ii) the amount of $657,738 attributable to PSI's exclusion from income of $1,930,029 of fuel cost overrecoveries returned to its customers in 1990, or alternatively, $657,738 attributable to PSI's deduction under Section 162 for returning $1,930,029 of fuel cost over-recoveries to its customers; and (iii) the amount of $279,018 relating to PSI's $824,181 costs for removing and encapsulating asbestos in 1990. Trial,

held on March 12, 2002, was limited to issues of liability, and was followed by a series of post-trial briefings.

## II.  DISCUSSION

Against this factual backdrop, the court turns to the case at bar. As noted, three separate and distinct issues are presented here, which issues the court, in successive legs of its journey, will address *seriatim.*

### A.  Section 1341 Issue

Although the Code offers various lexicographic constellations by which to navigate the frontiers of tax accounting, the Polaris of this universe is indisputably the annual accounting concept, which necessitates a yearly determination of reportable income. *See Burnet v. Sanford & Brooks Co.,* 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931). Yet, in some cases, this guiding light shines harshly on taxpayers who find themselves in receipt of funds before their rights therein are choate. Even though such taxpayers may eventually be obliged to disgorge such amounts, they are, nonetheless, required to take the funds into income in the year of receipt, if subject to the taxpayer's control. If an amount corresponding to the same income item is then repaid in a later year, oft-litigated questions arise as to whether, and in what fashion, the amount refunded is deductible as against future income. *See* Harold Dubroff, "The Claim of Right Doctrine," 40 Tax L.Rev. 729 (1985) (hereinafter "Dubroff"). Such questions loom on the horizon here.

Beginning in the 1960s and continuing until mid–1988, PSI collected from its cus-

12. Of this amount, $483,092.22 was for the removal of asbestos; $296,088.78 was for encapsulation; and $45,000 was for fireproofing replacement. Plaintiff's complaint only referred to the removal and encapsulation costs and made no reference to the fireproofing replacement. Likewise, its pretrial filings did not disclose that it was seeking any deduction with respect to the latter fireproofing costs, and said costs were not referred to in the stipulation filed by the parties. At trial, the only witness plaintiff called to discuss the asbestos removal and encapsulation, Mr. Beal, its facilities engineer, was unaware that Centin had even been paid for new fireproofing, feeling that the bill that reflected such costs might have been mistaken. Plaintiff first square-

ly indicated that it was seeking to deduct the cost of the fireproofing material in its post-trial briefs. In this court's view, by failing to raise this issue earlier so as to allow for its proper development at trial, plaintiff has waived any entitlement to deduct this amount.

13. The record indicates that PSI internally characterized the asbestos removal and encapsulation as a maintenance, rather than capital, project. This is reflected in work order authorization forms, internal memoranda, the minutes of office meetings and recorded communications with the contractor.

tomers amounts to pay "deferred taxes." Deferred taxes generally are those that a company anticipates paying in the future as a result of its current operations or activities. Under its accounting method, PSI included in income and thus paid taxes on all the amounts it collected from its customers to cover those deferred taxes in the years when it supplied the electricity associated with those charges. In connection with certain rate making proceedings, the Regulatory Authorities required PSI to relinquish in 1988 and 1989 some of the deferred tax amounts that had been collected over an approximately twenty-year period. PSI asserts that these transactions were "refunds" and that it is entitled to compute its tax liability for 1988 and 1989 in accordance with section 1341 of the Code, which, as will be seen, would allow PSI to obtain a higher refund than if it simply deducted the amounts relinquished currently as a trade or business expense. Plaintiff, of course, bears the burden of proving its entitlement to the tax treatment it seeks. *See, e.g., Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935) ("[u]nquestionably the burden of proof is on the taxpayer"); *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Cook v. United States,* 46 Fed.Cl. 110, 115–16 (2000).

■ Section 1341 of the Code was "enacted to alleviate some of the inequities which Congress felt" had been engendered by the so-called "claim of right" doctrine. *United States v. Skelly Oil Co.,* 394 U.S. 678, 681, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969). Claim of right cases tend to coalesce around some dispute over the ownership of income or a mistake of fact, deriving, for example, from a quarrel over the ownership of income producing property, the misapplication of a contract provision, or the payment of funds under a contingency based upon business expectations that were thought to, but actually did not, materialize. *See* Dubroff at 734–35; Note, "Taxing Unsettled Income: The 'Claim of Right' Test," 58 Yale L.J. 955, 960–61

(1949) (noting numerous cases). Under the doctrine, "[i]f a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *North Am. Oil Consol. v. Burnet,* 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197 (1932) (Brandeis, J.). Until the passage of section 1341, where this doctrine applied, a taxpayer required to repay amounts that it had included previously in income was allowed a deduction only in the year of repayment—due to the rigid annual accounting period, it could not recompute its income for the year in which the income was originally reported. Such was the holding of the Supreme Court in *United States v. Lewis,* 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560 (1951).

As noted, the Congress found this result inequitable and passed section 1341 to allow some taxpayers to instead compute the deduction for the year an amount was repaid by reference to the taxes paid in the earlier year in which the item was originally received.[14] In pertinent part, that section provides—

**Section 1341 Computation of tax where taxpayer restores a substantial amount held under claim of right.**

■ (a) *General Rule.—If—*

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

---

14. *See* S.Rep. No. 83–1622 at 118 (1954); H.R.Rep. No. 83–1337 at A294 (1954); *see also Culley v. United States,* 222 F.3d 1331, 1334 (Fed.Cir.2000); *Dominion Resources, Inc. v.* *United States,* 219 F.3d 359, 362–63 (4th Cir. 2000); *Griffiths v. United States,* 54 Fed.Cl. 198, 201–02 (2002).

(i) the tax for the taxable year computed with such deduction; or

(ii) an amount equal to—

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter . . . for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

26 U.S.C. § 1341(a).[15] In order to qualify for this treatment, a taxpayer must prove that an item was included in its gross income for prior tax years because of an apparent unrestricted right to such item. *See Bailey v. Comm'r,* 756 F.2d 44, 47 (6th Cir.1985). Once that is established, a taxpayer must show that in a later tax year, it no longer had an unrestricted right to that item and that the repayment was deductible under some other provision of the Code. *See Skelly Oil,* 394 U.S. at 683, 89 S.Ct. 1379; *Bailey,* 756 F.2d at 46; *Griffiths,* 54 Fed.Cl. at 201–02. Where these requirements are met, "[section] 1341 is designed to put the taxpayer in essentially the same position [it] would have been in had [it] never received the returned income." *Dominion,* 219 F.3d at 363; *see also Bailey,* 756 F.2d at 46 ("Section 1341, in effect, gives a taxpayer benefits that would approximate a deduction in the year of receipt of the amount later restored when doing so results in a lower tax.").

**1. *Absolute vs. apparent* right to income—section 1341(a)(1).**

Defendant initially argues that PSI is not entitled to section 1341 treatment because it

had an "actual" right to the amounts collected from its ratepayers and thus did not "appear" to have such a right within the meaning of section 1341(a)(1). Taking this radical approach, defendant thus contends that PSI did not originally include the item in question in income under the "claim of right" doctrine, so as to trigger the application of section 1341. For its part, however, plaintiff asserverates that this *"actual vs. apparent"* distinction is a mirage and contrary to the statute's language, as evidenced by its repeated rejection by the courts, most recently in *Dominion Resources, Inc. v. United States,* 219 F.3d 359 (4th Cir.2000).

Because it is factually similar to the instant case, *Dominion* represents a good place from which to embark on consideration of this issue. There, a regulated public utility, DRI, was required to restore to its customers payments attributable to the deferred tax component of its cost of service, when, subsequent to those payments, the corporate tax rate was reduced, thereby diminishing the utility's deferred taxes. 219 F.3d at 361–62. As in the instant case, defendant argued that section 1341 did not apply to this transaction because the utility had an "absolute" right to the amounts collected in the earlier years. The Fourth Circuit made short shrift of this argument, holding that "[t]he plain language of § 1341 does not require the construction the IRS suggests," and asserting further—

Things very often "appear" to be what they "actually" are. As a matter of plain meaning, the word "appeared" generally does not, as the IRS urges, imply only *false* appearance, and generally does not

---

**15.** In describing the elements of this section, section 1.1341–1(a)(1)–(2) of the regulations provides—

(1) If, during the taxable year, the taxpayer is entitled under other provisions of chapter 1 of the Internal Revenue Code of 1954 to a deduction of more than $3,000 because of the restoration to another of an item which was included in the taxpayer's gross income for a prior taxable year (or years) under a claim of right, the tax imposed by chapter 1 of the Internal Revenue Code of 1954 for the taxable year shall be the tax provided in paragraph (b) of this section.

(2) For the purpose of this section "income included under a claim or right" means an item included in gross income because it appeared from all the facts available in the year of inclusion that the taxpayer had an unrestricted right to such item, and "restoration to another" means a restoration resulting because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item (or portion thereof).

26 C.F.R. § 1.1341–1 (1988).

exclude an appearance that happens to be *true*.

219 F.3d at 364 (emphasis supplied). It thus observed that "the statute does not require that the facts according to which the taxpayer lacks an unrestricted right to certain income must have existed in the prior tax year." *Id.* "In sum," it concluded, "the plain language of § 1341 offers little support for the IRS's position, and we are unconvinced that the statute is 'ambiguous.' Rather, taking the statute as a whole, it seems to us to permit taxpayers like DRI to avail themselves of its benefits." *Id.* at 365. In so holding, the Fourth Circuit aligned itself with prior decisions of the Fifth and Sixth Circuits. *See Cleave v. United States,* 718 F.2d 193, 197 (6th Cir.1983); *Prince v. United States,* 610 F.2d 350 (5th Cir.1980); *see also Wicor, Inc. v. United States,* 263 F.3d 659, 662 (7th Cir.2001) (Posner, J.) (noting this precedent while not deciding this issue).

On the surface, the formidable array of recent cases rejecting defendant's argument seemingly marks this court's path to decision. But, with all due respect, the court believes that there are significant subterranean cracks in the *ratio dicendi* of these cases.

Beginning, as we must, with the statute's language,[16] the first thing evident is that the "plain language" of the statute does *not* contradict defendant's position. To be sure, the primary definitions of the verb "appear," as well as the related adjective "apparent," both focus on that which is "in sight," "visible" or "plain."[17] Although unexplained in *Dominion* and the earlier cases on which it is based, this primary meaning perhaps was the one invoked in support of the supposed "plain meaning" of the statute. Nonetheless, a second well-accepted meaning of "appear," and, its adjectival first cousin "apparent," is to

describe a circumstance that seems true, but is not. For example, *Webster's* alternatively defines "appear" as "to have an outward aspect: seem." It likewise defines "apparent" as to "manifest to the senses or mind as real or true on the basis of evidence that may or may not be factually valid," further indicating that this word "suggests appearance to unaided senses that is not or may not be borne out by more rigorous examination or greater knowledge." *Webster's* at 56. In similar vein, the *American Heritage Dictionary* defines "appear" as "[t]o seem or look to be," and "apparent" as "[a]ppearings as such but not necessarily so; seeming." *The American Heritage Dictionary* at 85, 86. These secondary definitions—summed up as that which seems to be true, but is at least questionable—linguistically fit defendant's construction of section 1341(a)(1) like a glove of the finest leather; that is, the section applies only to one who seemed to, but did not, have an absolute right to a particular item of income.

▉ At the least, these varied dictionary definitions suggest that the language of the statute is sufficiently ambiguous to warrant reference to its legislative history. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *see also Chernin v. United States,* 149 F.3d 805, 816 (8th Cir.1998). That legislative history indicates that the statute was enacted to ameliorate the impact of the claim of right doctrine and, in particular, to modify the Supreme Court's decision in *Lewis*—a claim of right decision in which, as noted, the Court held that the only deduction available to an individual required to refund an amount originally included in income under a claim of right was one in the year of the refund.[18] Congress deemed the latter result inequitable because in many instances "the deduction

---

**16.** *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In analyzing this language, the court is guided by a "fundamental canon of statutory construction," to wit, that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

**17.** *The American Heritage Dictionary of the English Language* 84, 85 (4th ed.2000); *Merriam-Webster's Collegiate Dictionary* 56 (10th ed.1998).

**18.** In *Lewis,* the taxpayer received a bonus from his employer in the amount of $22,000 and reported it as income. Subsequent litigation revealed that the bonus had been improperly computed and resulted in Lewis returning approximately half of the bonus. 340 U.S. at 590–91, 71 S.Ct. 522. Lewis brought suit seeking to recover a portion of the tax paid in the year he received the bonus. The Court, however, only

allowable in the later year does not compensate the taxpayer adequately for the tax paid in the earlier year." H.R.Rep. No. 83–1377 at 86–87 (1954); S.Rep. No. 83–1622 at 118, 451 (1954).[19] The purpose of section 1341, then, was to place a taxpayer that had been impacted by the claim of right doctrine in no worse tax position than he would have been had he never recognized the income originally.[20] *See Skelly Oil*, 394 U.S. at 681, 89 S.Ct. 1379; *Missouri Pacific R.R. Co. v. United States*, 191 Ct.Cl. 61, 423 F.2d 727, 731 (1970); *Fleet Carrier Corp. v. Comm'r*, 37

19. A number of the provisions in the Internal Revenue Code of 1954 derived from suggestions that the Congress received in surveys conducted by the Joint Committee on Internal Revenue Taxation. As such, it is worth mentioning that in suggesting the passage of what became section 1341, the Joint Committee directly tied the rationale for such a provision to the claim of right doctrine, thusly—

Under Supreme Court decisions, where a taxpayer receives an amount of income in one year under a claim of right so that he can at that time use it as he wishes, the amount is taxable in the year of receipt even though he may subsequently be compelled to repay it to an adverse claimant (the amount so repaid being deductible in the year of repayment). In some cases, however, the taxpayer is subject to heavy taxes for the year of receipt and may have little or no income in the year of repayment against which to claim the deduction. It is suggested that whenever a taxpayer receives income under a mistake, which he must ultimately repay, a proper adjustment be made in the year of receipt, rather than a deduction in the year of repayment.

*See* Staff of the Joint Committee on Internal Revenue Taxation, Preliminary Digest of Suggestions for Internal Revenue Revision Submitted to the Joint Committee on Internal Revenue Taxation 136 (1953).

20. Regarding this same legislative history, the Fourth Circuit, in *Dominion*, observed—

Both the House and Senate Committee Reports accompanying § 1341 state that the statute will apply "[i]f the taxpayer included an item in gross income in one taxable year, and in a subsequent taxable year he becomes entitled to a deduction because the item or a portion thereof is no longer subject to his *unrestricted use.*" .... Not only does this statement provide no support for the reading of the statute that the IRS favors, but the verb tenses clearly indicate that Congress did not intend the IRS's interpretation. The use of the present tense in the committee reports strongly suggests that a taxpayer may enjoy the benefits

T.C. 527, 536, 1961 WL 1095 (1961). Subsequent legislative history demonstrates that Congress has adhered to this view of the statute, over time, through several amendments.[21] Overall, then, this legislative history confirms that, as its title states, section 1341 was only intended to cover "[c]omputation[s] of tax where taxpayer restores substantial amount held under *claim of right.*"[22]

■ Out of this realization emerges a limiting principle because the claim of right

of § 1341 even if his *unrestricted right* to use the income did not end until the "subsequent taxable year."

219 F.3d at 365 (emphasis added). In this court's view, these comments read far too much into the reports' use of the present tense in the phrase "is no longer subject to his unrestricted use." Contrary to the Fourth Circuit's claim, use of this language does not suggest than an actual right to income is not disqualifying—rather, under the claim of right doctrine one must have an apparent right to income *and* the unrestricted use thereof. The committee reports' language refers to the second of these requirements, not the first, and, particularly does not indicate that one with an "unrestricted right" qualifies.

21. Thus, for example, in the legislative history of the Technical Amendments Act of 1958, P.L. 85–866, Congress described the purpose of the statute as follows:

Under section 1341 of the 1954 Code, if a taxpayer must restore a substantial amount, *which had previously been included in income under a claim of right,* his tax for the year of restoration is computed on the basis of allowing a deduction for the restoration or alternatively of computing the decrease in tax for the year of inclusion as if the inclusion had not been affected and reducing the current year's tax by that decrease, whichever computation results in the lesser tax.

Conf. Rep. No. 85–2632 at 34 (1958) (emphasis added); *see also* S.Rep. No. 85–1983 at 83 (1958). Explicit, albeit less descriptive, references to the claim of right doctrine may also be found in the legislative history of acts amending the statute in 1962 and 1976. *See* H.R.Rep. No. 94–658 at 395 (1975); Conf. Rep. No. 87–2555 at 3935 (1962); *see also* 108 Cong. Rec. 22541 (October 5, 1962) (statement of Senator Kerr) (*sponsor of the 1962 amendment to section 1341* describing the section as involving "the restoration of a claim of right item").

22. The court, however, does not attach independent significance to this title, *see* 26 U.S.C. § 7806(b) (descriptive matter in Code not to be given legal effect); *cf. Chernin*, 149 F.3d at 816.

allowed him a deduction in the year of repayment. *Id.* at 592, 71 S.Ct. 522

doctrine simply does not apply where an individual receives an item of income under an "absolute" right. Numerous cases so hold. For example, in *Equitable Life Ins. Co. of Iowa v. United States*, 340 F.2d 9 (8th Cir.1965), the taxpayers, who were life insurance companies, redeemed various government bonds before maturity and were required to refund to the United States part of the interest previously received thereon. They sought to offset the refunded interest against other investment income, invoking the claim of right doctrine. *Id.* at 14. The Eighth Circuit, however, rejected this approach, explaining:

> The facts here are wholly incompatible with the doctrine. There was never any question of the absolute right of appellants to collect and receive the interest on the government bonds. The refund of a part of the interest received was not brought about because of adverse claims to the amounts refunded, but because appellants voluntarily exercised their option to redeem the bonds before maturity. As a condition precedent to such redemption appellants were required to refund a part of the interest previously received by them. Clearly the facts are inadequate to warrant application of the claim of right doctrine, and appellants were not entitled on the basis of such doctrine to offset the amount of interest refunded against their investment income.

*Id.* at 15. The Tax Court made similar observations in *Grandview Mines v. Comm'r*, 32 T.C. 759, 1959 WL 1248 (1959), *aff'd*, 282 F.2d 700 (9th Cir.1960). There, a mining company received royalties in 1950, but was required to refund a portion thereof under a new lease agreement entered into in 1951. The Tax Court rejected the company's claim that it was entitled to deduct the refunded royalties in 1951 under the claim-of-right doctrine, stating:

> In the instant case, there was never any question either in 1950 or subsequently but that petitioner was entitled absolutely, under the terms of the then existing contract, to the $18,957.20 received in 1950.... [N]either petitioner nor [its lessor] raised any question as to the proper computation to arrive at the amount.... Thus the inclusion of the $18,957.20 in 1950 income is not grounded on a theory that petitioner received it under a claim of right but on the simple incontrovertible fact that it received it under an absolute right.

32 T.C. at 771; *see also Dri–Powr Distributors Ass'n Trust v. Comm'r*, 54 T.C. 460, 473, 1970 WL 2211 (1970). These cases thus demonstrate that the claim of right doctrine is not the *sine qua non* of what is income, but rather is a concept limited to a relatively narrow band of circumstances that does not include situations in which a taxpayer receives income under an actual right.[23]

Further evidence of this emerges from a series of cases dealing with prepaid income, highlighted by a well-known trilogy of Supreme Court decisions—*Automobile Club of Michigan v. Comm'r*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), *American Auto. Ass'n v. United States*, 367 U.S. 687, 700, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961) and

**23.** *See* 2 *Merten's The Law of Federal Income Taxation* § 12A:119 (2002) ("the claim-of-right rule is not involved where the taxpayer makes his receipt as a matter of uncontested, absolute right, where there exists no legitimate dispute to the taxpayer's entitlement"); Boris I. Bittker & Martin J. McMahon, Jr., Federal Income Taxation of Individuals ¶ 4.03[4] (2d ed. 2003) ("If the taxpayer's right to the item was unchallengeable in the year of inclusion ..., but was undermined by facts arising subsequently, § 1341 does not apply, because it was not established until a later year that the taxpayer did not have an unrestricted right to the item in the year of inclusion"); Federal Tax Coordinator ¶ G–3014 (2d ed. 2003) ("This means that the taxpayer must have had a semblance of an unrestricted right to the item in the inclusion year, as distin-guished from an unchallengeable right (which is more than an apparent right), and from absolutely no right at all (which is less than an apparent right)."); Steven J. Willis, "The Tax Benefit Rule: A Different View and a Unified Theory of Error Correction", 42 Fla. L.Rev. 575, 598 (1990) (hereinafter "Willis") ("The appearance factor is significant. If the taxpayer legitimately had such an unrestricted right, then 1341 will not apply to a later restoration of the item"); Robert R. Wootton, "The Claim of Right Doctrine and Section 1341," 34 Tax Lawyer 297, 297 (1980)("Historically, the claim of right doctrine has been applied in a variety of contexts having a common factual element: the receipt of money or other property by a taxpayer with an imperfect right to retain it").

*Schlude v. Comm'r,* 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963). In those cases, entities using the accrual method of accounting received prepayments for services to be rendered in the future. They typically argued that the amounts received should be accrued only when the respective services were rendered, while the government, at least initially, contended that the taxpayers were required to include the prepaid amounts in income in the year of receipt under the "claim of right" doctrine. While the government initially prevailed on that theory in the Tax Court, it subsequently suffered a series of appellate losses, beginning with *Beacon Publishing Co. v. Comm'r,* 218 F.2d 697 (10th Cir.1955). There, the Tenth Circuit rejected the Tax Court's application of the claim of right doctrine, reasoning, in part, "there is no dispute as to the ownership of the funds ... they belong to the taxpayer with no restriction as to disposition." 218 F.2d at 700–01. In short order, *Beacon* was followed by two other circuits.[24]

When the prepaid income issue finally reached the Supreme Court, the government, undoubtedly reacting to its prior losses, deemphasized its reliance on the claim of right doctrine in favor of arguing that the taxpayer's method of accounting did not clearly reflect income. In *Automobile Club,* the first of the trilogy, the Supreme Court adopted the latter theory, barely discussing the former. *Automobile Club,* 353 U.S. at 188–89, 77 S.Ct. 707. That did not prevent Justice Harlan, in his dissent, from explicitly rejecting the lower court's reliance on the claim of right doctrine, stating:

> The Commissioner seeks to justify that course under the "claim of right" doctrine announced in *North American Oil Consolidated v. Burnet,* 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197. However, that doctrine, it seems to me, comes into play only in determining whether the treatment of an item of income should be influenced by the fact

that the right to receive or keep it is in dispute; ...

353 U.S. at 191–92, 77 S.Ct. 707. Next, in *American Auto. Ass'n,* the government went one step further, forsaking its claim of right argument entirely. Commenting on this concession, the four dissenting justices (again including Justice Harlan) stated that "[i]n this case, the Government abandoned that argument, with good reason," noting further that "the claim of right doctrine furnishes no support for the government's position." *American Auto. Ass'n,* 367 U.S. at 700, 81 S.Ct. 1727. Similar sentiments were echoed by the dissenters in *Schlude,* the last of the prepaid income trilogy. 372 U.S. at 139, 83 S.Ct. 601 (Stewart, J., dissenting) (finding the claim of right doctrine has no "relevance or applicability" to this case). In this court's view, the rejection of the claim of right doctrine by *Beacon* and its progeny, its subsequent abandonment by the government, and the dissenting opinions in the prepaid income trilogy all serve collectively to delimit the contours of the claim of right doctrine in a fashion that leaves PSI on the overedge of our figurative map—that is, on the outside looking in. Merten's again puts it well, indicating that these cases "held that the claim-of-right doctrine is inapplicable to prepaid income received under the accrual method, where there existed no dispute upon the ownership of the funds and where the only issue was the year of their inclusion in income." Mertens, § 12A:121.

Accordingly, while the legislative history of section 1341 indicates that it is limited to individuals adversely affected by the claim of right doctrine, the case law, supported by considerable commentary, demonstrates that doctrine does not apply to those who have an "actual," rather than "apparent," right to an item of income. It follows, *modus ponens,* that individuals with an actual, unqualified right to an item of income are not covered by section 1341.[25]

---

24. *See Bressner Radio, Inc. v. Comm'r,* 267 F.2d 520, 524–27 (2d Cir.1959); *Schuessler v. Comm'r,* 230 F.2d 722, 725 (5th Cir.1956) (stating that *Beacon Publishing* "correctly, we think, disposed of the 'claim of right' theory advanced by the Commissioner and adopted by the Tax Court in this type of case"); *see also* Laurie L. Malman, "Treatment of Prepaid Income—Clear

Reflection of Income or Muddied Waters," 37 Tax L.Rev. 103, 107–119 (1981) (discussing these and the other prepaid income cases).

25. The court notes that this position is supported by various revenue rulings. *See* Rev. Rul. 67–437, 1967–2 C.B. 296, 1967 WL 15145; Rev. Rul. 67–48, 1967–1 C.B. 50, 1967 WL 15382; Rev.

To cinch matters, it must be noted that while defendant has lost this point in various courts, it has prevailed elsewhere. Thus, for example, the Tax Court repeatedly has concluded that "[w]e are of the opinion that, to become entitled to relief under Section 1341, a taxpayer must prove by a preponderance of the evidence that he was not entitled to the unrestricted use of the amount received in the prior year." *Pike v. Comm'r,* 44 T.C. 787, 800, 1965 WL 1206 (1965); *see also Barrett v. Comm'r,* 96 T.C. 713, 1991 WL 80644 (1991); *Usher v. Comm'r,* 40 T.C.M. (CCH) 385, 1980 WL 4026 (1980) ("Section 1341 does not apply where the taxpayer did, in fact, have an unrestricted right to receive the amount in the prior year"); *Blanton v. Comm'r,* 46 TC. 527, 1966 WL 1180 (1966), *aff'd,* 379 F.2d 558 (5th Cir.1967).[26] Various other cases, including several circuit opinions, also appear to have adopted defendant's argument in preventing taxpayers from invoking section 1341 where they initially had an absolute right to the item of income in question. *See Bailey v. Comm'r,* 756 F.2d 44 (6th Cir.1985); *Kappel v. United States,* 437 F.2d 1222 (3d Cir.1971); *Hope v. Comm'r,*

471 F.2d 738, 743 (3d Cir.1973); *Parks v. United States,* 945 F.Supp. 865 (W.D.Pa. 1996); *Prince v. United States,* 1978 WL 4587, 78–2 USTC ¶ 9766 (S.D.Ala.1978), *aff'd in part, rev'd in part, on other grounds,* 610 F.2d 350 (5th Cir.1980). Surveying these cases, yet another commentator has aptly observed that they "establish a strong line of precedent that [a] taxpayer must have only an apparent right to the income." Edward J. Schnee, "Dominion Resources: Powering Section 1341 Toward Equity," 16 Akron Tax J. 133, 135–39 (2001).[27]

■ Based on its analysis of the statute, its legislative history and the case law, this court, therefore, concludes that an entity which had an actual, rather than apparent, right to funds does not meet the threshold requirement of section 1341(a)(1). Those are the facts here. When PSI received the deferred tax income and other income in question, it clearly had an absolute right thereto under the rate schedules then in effect. Thus, this is not a case where a utility obtained funds in one year based upon a mistaken calculation or the seeming triggering of a condition precedent later found not to

Rul. 58–226, 1958–1 C.B. 318, 1958 WL 10743. Revenue Ruling 67–437, *supra,* summarizes the rationale of these rulings thusly—

> However, section 1341 of the Code is not applicable when the taxpayer did, in fact, have an unrestricted right to receive the amount and where the obligation to repay arose as the result of subsequent events. If the instant taxpayers in a subsequent year should repay the disallowed amounts to the corporation, it will not be because it was established after the close of the prior taxable year in which the money was received that the taxpayers did not have an unrestricted right thereto in such prior year, but because a liability on their part has later accrued which does not in any way establish that they had no right to the money when received.

1967–2 C.B. at 296. Though limited in their impact, these rulings are entitled "to some weight as reflecting the Commissioner's interpretation." *Spang Industries, Inc. v. United States,* 791 F.2d 906, 913 (Fed.Cir.1986); *see also Xerox Corp. v. United States,* 228 Ct.Cl. 406, 656 F.2d 659, 671 n. 20 (1981) ("[w]hile these rulings are not binding on the Secretary of Treasury or the courts, they may be helpful in interpreting a statute"); *Vons Cos., Inc., v. United States,* 51 Fed.Cl. 1, 9 (2001) (same).

**26.** Apparently, the Fourth Circuit was unaware of these cases when, in *Dominion,* it stated: "[a]lthough the tax court has on occasion denied

certain taxpayers the right to avail themselves of § 1341, it has never adopted the IRS's distinction between actual versus apparent claims of right as the basis for such decisions." 219 F.3d at 366.

**27.** Although the Federal Circuit has yet to rule on this issue, its opinion in *Culley v. United States,* 222 F.3d at 1335–36, arguably supports the notion that an actual right to income is disqualifying. In that case, the court held that an individual who had participated in a kickback scheme could not invoke section 1341 because it could not appear to that individual that he had an unrestricted right to that income in the year of the receipt. In so ruling, the court followed *McKinney v. United States,* 574 F.2d 1240, 1243 (5th Cir.1978), and focused on what the taxpayer himself knew based on " 'all of the facts available in the year' that the taxpayer included the amount in question in his gross income." *Culley,* 222 F.3d at 1335 (quoting Treas. Reg. § 1.1341–1(a)(2)). In this court's view, the use of this subjective standard is more consistent with the secondary meaning of the word "appear." *See* Boris I. Bittker & Martin J. McMahon, Jr., Federal Income Taxation of Individuals ¶ 4.03[4] & n. 46 (citing *Culley* in support of the *"apparent vs. actual"* distinction drawn herein).

have occurred. Rather, plaintiff included the amounts in question in income not under the claim of right doctrine at all, but consistent with the broader notion that income is an "undeniable accession[ ]to wealth, clearly realized, and over which the taxpayers have complete dominion." *Comm'r v. Glenshaw Glass Co.,* 348 U.S. 426, 431, 75 S.Ct. 473, 99 L.Ed. 483 (1955). As such, PSI does not meet the first requirement of section 1341, rendering that section unavailable.

**2. The nexus requirement—section 1341(a)(2).**

Even if plaintiff met this first requirement, defendant contends that PSI failed to comply with the nexus requirement of section 1341(a)(2), because the repayments in questions did not arise out of the circumstances, terms and conditions of the original payment of the income in question. Plaintiff agrees that there must be some nexus between its original receipt of income and the repayments in question, but asserts that it has factually demonstrated such a tie. As will be seen, however, the hachure in the evidentiary record here points otherwise.

█ We begin with common ground—and, fortunately, here, no brewing intercircuit conflict. Courts have universally ruled that there must be a "substantive nexus between the right to the income at the time of receipt and the subsequent circumstances necessitating a refund." *Dominion Res., Inc. v. United States,* 48 F.Supp.2d 527, 540 (E.D.Va. 1999), *aff'd,* 219 F.3d 359 (4th Cir.2000). "In other words," this court recently stated, "the obligation to repay the money must arise from the 'same circumstances, terms and conditions of the transaction whereby the amount was included in income.'" *Griffiths,* 54 Fed.Cl. at 202 (quoting *Kraft v. United States,* 991 F.2d 292, 295 (6th Cir.1993)). This construction of the statute originated in *Blanton, supra,* where the taxpayer repaid to his corporate employer the portion of salary that was deemed by the IRS to be nondeductible by the corporation and attempted to invoke the benefits of section 1341 as to the repayment. The Tax Court, however, held that section was inapplicable to the repayment, explaining—

Under section 1341(a)(2), the requisite lack of an unrestricted right to an income item permitting deduction must arise out of the circumstances, terms, and conditions of the original payment of such item to the taxpayer and not out of circumstances, terms, and conditions imposed upon such payment by reason of some subsequent agreement between payor and payee.

46 T.C. at 530; *see also Bailey,* 756 F.2d at 47; *Hope,* 471 F.2d at 743; *Uhlenbrock v. Comm'r,* 67 T.C. 818, 823, 1977 WL 3755 (1977); *Pahl v. Comm'r,* 67 T.C. 286, 289–291, 1976 WL 3655 (1976); *Usher,* 40 T.C.M. at 392–93. Accordingly, if the taxpayer "voluntarily took some action after the receipt of apparently unrestricted income which required the taxpayer to thereafter return the remuneration," section 1341 does not apply. *Wicor, Inc. v. United States,* 117 F.Supp.2d 855, 862 (E.D.Wis.1999), *aff'd,* 263 F.3d 659 (7th Cir.2001); *see also United States v. Simon,* 281 F.2d 520, 526 (6th Cir.1960).

Like two banks of a river, the "same circumstances" test embodied in section 1341(a)(2) parallels the *"actual vs. apparent"* distinction in section 1341(a)(1), together channeling the flow of benefits from this section. As noted, the claim of right doctrine does not apply if a taxpayer has an actual, rather than apparent, right to income. In such a case, any subsequently required repayment almost necessarily must arise from circumstances, terms or conditions unrelated to the original payment of the item; were things otherwise, the original payment would not have derived from an actual right, but rather an apparent one. So construed, paragraphs (1) and (2) of section 1341 introduce a symmetry into the statute designed to ensure that section 1341 is properly invoked only by those individuals actually harmed by the claim of right doctrine. Indeed, there are hints of this even in the opinions rejecting the *"apparent vs. actual"* distinction, many of which have observed that the "same circumstances" rule incorporates a like purpose. *See, e.g., Dominion,* 219 F.3d at 368 & n. 4. Yet, by delinking these two requirements (by defenestrating the first), these cases raise concerns that a court might accept too remote a linkage between the original payment

**508**

and repayment of an item as satisfying the nexus requirement. In this court's view, the Congressional intent underlying section 1341 is better effectuated by applying both requirements, which, when applied in tandem, doubly verify that a particular transaction did or did not implicate the claim of right doctrine. *See* Willis, 42 Fla. L.Rev. at 598 (the requirement in section 1341(a)(2) "reinforces the ... notion that the inclusion must have resulted from a reasonable mistake").

█ Having established these ground rules, we return to the particulars of the case at hand. Defendant contends that PSI's return of deferred taxes in 1988 and 1989 did not arise from the same circumstances under which those taxes were collected but instead was prompted by subsequent and unrelated events, *to wit,* PSI's recovery from its financial crisis, its customers' demand for reduced rates and the IURC's investigation of that demand. The record overwhelmingly bears this claim out. Thus, the June 1, 1988, IURC order that required the return of the deferred taxes was prompted by several petitions filed by customer groups seeking a reduction in PSI's rates. These petitions caused the IURC to investigate the reasonableness of those rates. Notably, neither the petitions nor the initial investigation by the IURC dealt with deferred taxes. Rather, this issue was first raised when, in response to the consumer petition and the IURC investigation, PSI filed its own petition proposing a rate reduction, but seeking to ameliorate the effect of that reduction on its equity by an accelerated reversal of certain deferred tax reserves. The proposed return of

the deferred taxes thus was unrelated to any change in corporate tax rates or other circumstance that would suggest that the amounts originally collected were excessive or otherwise unneeded. PSI eventually entered into a settlement agreement with several customer groups that, in the main, adopted the approach taken in its petition, which settlement led to a joint proposed order that was adopted by the IURC. The event giving rise to PSI's original receipt of the deferred tax amounts—the need to fund its future income tax liability—thus was not attributable to any change in that tax liability or the need to fund it, but rather to a rate reduction triggered by PSI's economic recovery and carefully calibrated to perpetuate that recovery. Under these circumstances, the nexus required by section 1341(a)(2) is not present.

For its part, plaintiff argues that the collection of the deferred tax amounts from its customers and its later return of those amount arose from the same circumstances, *to wit,* the regulatory determinations by the IURC and the FERC as to the appropriate amount of deferred taxes to be included in its rates. *Per contra.* Nothing in the case law suggests that the requisite nexus is satisfied simply because the receipt of income and its later return both derived from the same regulatory process. To so hold would be tantamount to exempting all public utilities from meeting the requirements of section 1341(a)(2) and, contrary to intimations in some cases, there is simply no indication—in the statute, its legislative history or otherwise—that Congress intended such a result.[28]

---

28. In *Dominion,* the Fourth Circuit held that denying relief to the utility there "seems at odds" with section 1341(b)(2). 219 F.3d at 365. In paragraph (2), the Congress expressly provided that section 1341(a) does not apply to deductions resulting from "inventory sales or sales of stock in trade." The same paragraph, however, indicates that this disqualification rule does not apply if the deduction "arises out of [government required] refunds or repayments with respect to rates made by a regulated public utility." The Fourth Circuit viewed the latter language as an indication that Congress did not intend to limit section 1341 to cases in which income was originally taxed only under a claim of right, stating that "[i]t seems quite implausible that Congress would specifically authorize public utilities to benefit from § 1341 if the situations in which

they could obtain such a benefit were so limited." 219 F.3d at 365. This conclusion, however, is a *non sequitur.* The language in the latter portion of section 1341(b)(2), merely exempts qualified public utilities from the prohibition in the first sentence of that paragraph and does not purport to relax the requirements of section 1341. The Fourth Circuit seemed to understand this point earlier in its opinion, when it stated that under section 1341(b)(2) "a regulated public utility ... would be able to benefit from § 1341 when forced by a regulatory authority to refund rate payments to its customers, *if the utility otherwise complied with the requirements of § 1341.*" 219 F.3d at 363 (emphasis added). Accordingly, nothing in section 1341(b)(2) suggests that section 1341(a) automatically applies

Contrary to plaintiff's importunings, it is nose-on-the-face plain that, in critical regards, the facts here are dissimilar to those in *Dominion.* As discussed above, in that case, the utilities collected deferred taxes from their customers to pay their future tax liabilities. However, because of a 1986 reduction in the federal corporate tax rate, the amount the utilities collected was greater than what they needed to pay their future taxes and the regulators ordered them to refund the excess portion to their customers through a one-time cash payment. On these facts, the Fourth Circuit concluded that the event which gave rise to the collection of the deferred taxes—the utility's future federal income tax liability—and the event which gave rise to the refund of such taxes—an adjustment in that same future tax liability—were sufficiently related to meet the same circumstances test. Such is not the case here.

To be sure, like the utilities in *Dominion,* PSI collected the deferred taxes in question to pay its future tax liability. But, unlike the *Dominion* utilities, the refund of the deferred tax here was not occasioned by a change in PSI's future tax liability, but rather a shift in its overall financial fortunes and a desire to restructure its balance sheet. This signal difference is confirmed by the record.[29] Indeed, PSI explicitly acknowledged this in its Joint Proposed Order, which stated that "[t]he accelerated reversal of the

specified deferred income taxes . . . is considered to be a unique event occasioned by the peculiar financial emergency conditions of PSI as found in the March, 1986 Order, which conditions continue." The same order noted that the reversal of the deferred taxes was designed to "offset the negative impact on PSI's equity that would otherwise result from the proposed rate reduction."

In sum, the facts in this case, viewed through the alidade of the law, reveal that plaintiff also failed to meet the second requirement of section 1341.

### 3. The independent deduction requirement—section 1341(a)(2)

Finally, as noted above, to qualify for section 1341 relief, a taxpayer must be authorized to deduct the item at issue under some other provision of the Code. *See, e.g., Wood v. United States,* 863 F.2d 417, 420 (5th Cir. 1989). On this count, recall that, in 1988 and 1989, PSI returned the deferred tax amounts at issue by making a one-time lump sum payment of $50,013,000 and agreeing to offset $82,812,5000 against amounts otherwise charged to its customers. Plaintiff asserts that these amounts were "refunds" deductible as ordinary and necessary business expenses under section 162 of the Code.[30] *See, e.g., Skelly Oil,* 394 U.S. at 683–84, 89 S.Ct. 1379. Not so, defendant contends, claiming

---

in the circumstances of a case such as this. *See Fla. Progress Corp. v. Comm'r,* 114 T.C. 587, 597, 2000 WL 889750 (2000) ("the language of section 1341(b)(2) that refers to utility refunds . . . does nothing more than create an exception to the exclusion for the sale of inventory items, also found in section 1341(b)(2).").

**29.** Thus, in testimony submitted to the IURC, Mr. Hebble, then PSI's Vice President of Financial Operations, summarized the reason why the company filed the amended petition stating— "The company filed the amended petition in order to obtain certain modifications to the commission's March 7, 1986, order and thereby permit the company to reduce its retail electric rates 20 months early and in a manner that would not impair the company's ability to attain the financial restructuring objectives set forth in that order." At trial, Mr. Winger indicated that the petition was filed for three reasons: (i) as a response to the outside efforts of the consumer groups to seek rate reductions; (ii) to deal with

the investigation the IURC ordered to examine PSI's rates; and (iii) because the Consumer Counselor who had supported the settlement in 1986 indicated that it might be appropriate to make some rate adjustment. When asked whether, at this time, PSI would have sought an accelerated reversal of its deferred income taxes without these outside pressures, Mr. Winger responded, "[n]o. I really don't believe there would have been." Finally, it should be noted that the record reflects that, after the years in question, the Indiana Supreme Court eventually required PSI to refund that portion of its deferred taxes account that was unnecessary due to the drop in corporate tax rates that occurred in 1986. *See Citizens Action Coalition of Indiana, Inc. et al. v. PSI, Inc.,* 582 N.E.2d 330 (Ind. 1991).

**30.** Section 162(a) authorizes "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . ."

that the amounts at issue represented nothing more than a discount or reduction in PSI's rates, generating a reduction in its income and not deductible expenditure.

■ The question whether particular payments or offsets made by utilities are deductible under section 162, so as to trigger relief under section 1341, is hardly *terra nova*, having been addressed in several cases. These cases distinguish between true "refunds," which may be deductible, versus a lowering of rates or profits, which is nondeductible, by focusing on at least five factors: (i) whether the payments were made gradually over time or instead in a one-time, lump sum payment; (ii) whether benefits of the rate reduction were matched to the past customers who had actually been overcharged; (iii) whether the utility had segregated the funds or otherwise imposed limitations on its use of the money; (iv) whether interest was paid on the funds ultimately returned; and (v) whether the utility set off the amounts to be refunded against future amounts owed for good and services, rather than actually returning money to customers. *See, e.g., MidAmerican Energy Co. v. Comm'r*, 271 F.3d 740, 743 (8th Cir.2001), *aff'g*, 114 T.C. 570, 2000 WL 889758 (2000); *Wicor*, 263 F.3d at 662; *Dominion*, 219 F.3d at 368–69; *Roanoke Gas Co. v. United States*, 977 F.2d 131, 134–36 (4th Cir.1992); *see also Iowa Southern Utils. Co. v. United States*, 841 F.2d 1108, 1110 (Fed.Cir.1988). Where the payment is made in a single lump-sum matched to the customers who had actually been overcharged and paid from a segregated fund or with interest, the amount ordinarily is treated as a deductible refund. *See, e.g., Dominion*, 219 F.3d at 362. If, on the other hand, the amount is restored gradually over time to customers other than those who overpaid, is treated as an offset to amounts otherwise owed and includes no interest component, the amount ordinarily is treated as reduction in rates or future profits and is nondeductible. *See, e.g., MidAmerican*, 271 F.3d at 743. Plaintiff argues that this case is more like *Dominion*, while defendant, not surprisingly, suggests that it is more akin to *MidAmerican*.

■ As to the portion of the rate relief that involved a temporary rate reduction, defendant has the better case. Those amounts were shifted gradually over time (12 months for PSI's retail customers, 25 months for its wholesale customers), were not matched at all to the past customers, did not bear interest and took the form of offsets against amounts owed for other electricity. Indeed, based on the record, this part of the transaction represented little more than PSI shifting funds from one pocket (the deferred tax account) to another (its revenue account)—a rebalancing of its balance sheet that served important financial purposes, but seemingly should not have tax consequences. Such a finding is consistent with the IURC's June 1, 1988, order, which specifically found that "PSI's retail electric rates should be reduced," repeatedly referred to the twin percentage drops as "reductions in PSI's retail electric rates," and stated that "[t]his method essentially 'backs out' of rates the rate increases previously approved." [31] The only factor cutting against this finding is that the funds used in this offset had been segregated, at least for book accounting purposes, in the deferred tax account—however, as noted, that fact had nothing to do with the reason for the offsets. It thus does not alter the fact that the temporary rate reduction was just that—a mere rate reduction on future sales and not a true customer refund. As such, this portion of the adjustment was not a deductible expense. *See Roanoke Gas Co.*, 977 F.2d at 134; *see also MidAmerican Energy*, 271 F.3d at 743–44; *Wicor*, 263 F.3d at 662; *Iowa Southern Utils.*, 841 F.2d at 1110; *Southwestern Energy Co. v. Comm'r*, 100 T.C. 500, 506–07, 1993 WL 185898 (1993).

■ A more difficult question involves the deductibility of the portion of the rate relief that took the form of lump-sum cash payments that PSI made to existing customers via checks. As to these amounts, there are two strong indicia of deductibility—the payments were not made over time and were

---

**31.** Similar statements may be found in the documents concerning the reduction of PSI's wholesale rates. For example, the FERC letter effectively approving this change refers to it as a "two-step rate decrease applicable to 26 wholesale customers."

not setoff against amounts otherwise owed for services. In asserting that these cash payments were, nonetheless, nondeductible, defendant notes that PSI neither included an interest component therein nor attempted to match the refunds to the customers who originally paid the deferred taxes. Defendant cites *Florida Progress*, 114 T.C. at 596–97, as indicating that even a cash payment to a customer may be deemed a nondeductible rate reduction. However, the *Florida Progress* cash payments "represented funds that should have been refunded to customers under FERC regulations in previous months," and thus should have previously "been carried out by setoff on customers' bills." 114 T.C. at 596–97. These facts—not present here—are what led the Tax Court to concluded that "[c]ombined with the other characteristics of the refunds, this characteristic makes the returns by check resemble a reduction in rates rather than a deductible expense." *Id.* at 597.

On balance, this court believes that the $50 million cash payment is deductible. To be sure, at points in its June 1, 1988, order, the IURC seems to refer to the cash payment as being part of the reduction in PSI's retail electric rates. Yet, elsewhere in the same order, it clearly distinguishes between the reduction in rates and the cash payment—indeed, on at least one occasion referring to the latter payment as a "refund"—suggesting that while the cash was still viewed as part of the phase-out of PSI's emergency rates, it was fundamentally different from the rate reductions.[32] Critically, unlike the rate reductions discussed above, the cash payments actually shifted funds from PSI accounts to its customer's pockets and thus represented more than a mere rearrangement of PSI's books. As such, the court finds that this cash component represented either a true refund or, at least, some other form of deductible expense under section 162, thereby meeting the deduction requirement of section

1341(a)(2). *See Dominion*, 219 F.3d at 369 (holding that cash payments were refunds and deductible expenses for purposes of section 1341). Of course, this amount still is not entitled to section 1341 treatment for the other reasons discussed above.[33]

\* \* \* \* \* \*

Concluding this tour *d'horizon*, it appears evident that plaintiff's interpretation of section 1341 generally would "do violence to our system of annual accounting and payment of income taxes," *Missouri Pacific R.R. Co. v. United States*, 191 Ct.Cl. 61, 423 F.2d 727, 734 (1970), by converting an isthmian exception to that system into one that would have continental proportions, plainly contrary to Congressional intent. This exception would be particularly potent for regulated utilities—indeed, highlighting the breadth of what it seeks, PSI repeatedly argues that it met the requirements of section 1341 simply because its rates, and the receipts obtained thereunder, were always subject to future change by the regulatory authorities. The court rejects this argument, the adoption of which would dredge, for public utilities, a gaping safe harbor from the annual accounting principle. To be sure, section 1341 is a relief provision. But, Congress was not indiscriminate in its bounty and all signs suggest that plaintiff's case is outside the neatline of what Congress intended to remedy. For the reasons discussed above, the court concludes that plaintiff is not entitled to the beneficial tax treatment afforded by section 1341.

## B. PSI's Fuel Cost Overrecoveries.

At long last, we begin the second leg of our journey, which concerns the proper tax treatment of a portion of PSI's receipts constituting an overrecovery of its fuel costs. Under its fuel cost adjustment clause (FAC), PSI is required to adjust its rates, on a quarterly basis, to account for differences in its fuel

---

32. For example, in the critical paragraphs ordering the rate reduction, the IURC order stated that "[t]he reduction in PSI's retail electric rates and the $50 million cash payment ... should first be applied as an accelerated reversal of the deferred income taxes ..." The order reflects—accurately—that the cash payment was proposed

not by PSI, but by the Office of the Utility Consumer Counselor as a "refund."

33. Parenthetically, it should be noted that even if such amount is not entitled to section 1341 treatment, it may be currently deductible under section 162(a) of the Code.

costs. For retail customers, that quarterly adjustment is accomplished by an increase or decrease of PSI's rates for the upcoming quarter by its net under/overrecoveries incurred in the second succeeding quarter (*e.g.*, the net monthly incurred in April, May and June will result in an adjustment in September, October and November). For wholesale customers, a similar process was employed, except that the reconciliation occurred almost immediately, with over or underrecoveries for December, for example, being reflected in January. Plaintiff argues that its overrecoveries were burdened by an obligation to repay and thus did not constitute income.

Section 61(a)(1) defines gross income inclusively as "all income from whatever source derived." Congress enacted this language intending "to use the full measure of its taxing power." *Helvering v. Clifford,* 309 U.S. 331, 334, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *James v. United States,* 366 U.S. 213, 219, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). Effectuating this intent, the Supreme Court has construed the definition of gross income broadly to reach any undeniable accession to wealth realized by a taxpayer over which the taxpayer has "complete dominion." *Glenshaw Glass Co.,* 348 U.S. at 431, 75 S.Ct. 473. Along these lines, the Supreme Court has instructed that "[w]hen a taxpayer acquires earnings, . . . without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition," it has received income. *James,* 366 U.S. at 219, 81 S.Ct. 1052; *see also Comm'r v. Indianapolis Power & Light Co.,* 493 U.S. 203, 210, 110 S.Ct. 589, 107 L.Ed.2d 591 (1990); *Houston Indus., Inc. v. United States,* 125 F.3d 1442, 1444 (Fed.Cir.1997).

In *Indianapolis Power & Light Co., supra,* the utility, IPL, required certain customers to make deposits with it to assure prompt payment of future electric bills. 493 U.S. at 204, 110 S.Ct. 589. The deposits were received by IPL subject to an express obligation to repay them either at the time service was terminated or at the time a customer established good credit. Prior to terminating service, customers who satisfied a credit test could obtain a refund of their deposits or could choose to have the amount applied against future bills. *Id.* at 205, 110 S.Ct. 589. IPL paid interest on deposits held for longer periods (initially six months, but later twelve). While commingled with other company receipts and thus subject to IPL's unfettered use and control, these deposits were carried on IPL's books as current liabilities, in accordance with state administrative regulations. Under its accounting system, IPL recognized income when it mailed a monthly bill. If a deposit was used to offset a customer's bill, the utility made the necessary accounting adjustment and reflected that amount in income. *Id.* at 205, 110 S.Ct. 589. The IRS claimed that the deposits were advanced payment for electricity and, therefore, were taxable to IPL in the year of receipt. *Id.* at 205–06, 110 S.Ct. 589. The Tax Court rejected this theory, as did the Seventh Circuit, holding that the deposits were more in the nature of security.

Resolving a conflict between the Seventh and Eleventh Circuits, the Supreme Court unanimously rejected the IRS's position, holding that the test for whether deposit payments paid by customers constitute income when received by the taxpayer "turns upon the nature of the rights and obligations . . . assumed when the deposits were made." 493 U.S. at 209, 110 S.Ct. 589. Analyzing whether the taxpayer enjoyed "complete dominion" over the deposits, the Court opined that "the crucial point is not whether [its] use of the funds is unconstrained during some interim period," but whether "the taxpayer has some guarantee that [it] will be allowed to keep the money." *Id.* at 210, 110 S.Ct. 589. It found that the utility had no such guarantee, observing—

> The customer who submits a deposit to the utility . . . retains the right to insist upon repayment in cash; he may choose to apply the money to the purchase of electricity, but he assumes no obligation to do so, and the utility therefore acquires no unfettered "dominion" over the money at the time of receipt.

*Id.* at 212, 110 S.Ct. 589. The Court thus decided that, because it was within the customer's domain to prevent a forfeiture of a deposit payment and because the customer rather than the taxpayer determined how

and when a deposit payment was returned, the IPL's right to keep the funds in question remained contingent upon events outside of its control. The Court thereby concluded that "such dominion as IPL has over these customer deposits is insufficient for the deposits to qualify as taxable income at the time they are made." *Id.* at 214, 110 S.Ct. 589.[34]

Two recent Federal Circuit opinions—one predating *Indianapolis Power & Light,* the other not—have covered similar ground, thereby further blazing a helpful trail for this court to follow. In the earlier of these, *Iowa Southern Utilities, supra,* the Federal Circuit held that a special construction surcharge, which was refunded over thirty years, without interest, was taxable income. In so holding, the court noted that the rate increase was for the benefit of the utility—to finance construction—and the utility paid no interest on the funds. 841 F.2d at 1112. More critically, unlike *Indianapolis Power & Light,* the court identified no "unequivocal contractual, statutory, or regulatory duty to repay" the funds. *Id.* at 1112. In sum, the Federal Circuit recognized that, due to the absence of any independent repayment requirement, the *Iowa Southern* utilities had exercised dominion and control over the surcharge and derived benefit from their retention of the money, thereby requiring those sums to be included in income.

But, what if, instead, there is a regulatory duty to repay? The Federal Circuit spoke directly to that issue in *Houston Indus. v. United States,* 125 F.3d 1442 (Fed.Cir.1997). There, the court held that overrecoveries of fuel costs were not required to be included in income when the overrecoveries were part of a plan to create level pricing over a 12–month recovery period. As in the case *sub judice,* the taxpayer-utility collected funds from its customers equal to the fuel costs it expected to incur. The collections were based on estimates and subject to a reconciliation procedure to account for any over– or underrecoveries. The taxpayer argued that it was not required to report in gross income

overrecoveries for fuel costs that were in its possession at the close of the year. Interpreting *Indianapolis Power & Light Co.,* the Federal Circuit agreed, reasoning—

> In this case, the overrecoveries more closely resemble the deposits in *Indianapolis Power & Light* ... than the surcharges in *Iowa Southern.* First, ... the utility in the instant case, like the utilit[y] in ... *Indianapolis Power & Light* ... derived no benefit from retaining the overpayments. The stated purpose of the fixed fuel cost system is to increase the predictability and stability of monthly fuel charges for the benefit of customers, not the utility. In fact, the utilities, burdened by additional accounting and administrative responsibilities, derived little or no benefit under this system. Moreover HL & P accounted for full interest on the overrecoveries and petitioned to initiate a repayment when the overrecovery balance became excessive. Under these circumstances, HL & P acted as a custodian of these funds.
>
> Next, unlike the *Iowa Southern* utility, HL & P received these overrecoveries contingent upon a statutory obligation of repayment. Although the regulations could require HL & P to offset its overrecoveries against later underrecoveries, this alternative method of repayment is not the kind of contingency which affects HL & P's obligation to repay. The Court in *Indianapolis Power & Light,* in a case presenting even more repayment options, focused on the "express 'obligation to repay'" at the time of collection, not on the alternative forms of repayment. *Indianapolis Power & Light,* 493 U.S. at 210–11, 110 S.Ct. at 593–94. Although an offset against underrecoveries is not technically the same as a direct refund, both methods of repayment have the same economic effect.... While HL & P could not be certain, at the end of the tax years in question, of the method of repayment, its

---

34. For further commentary on this decision, *see* T. Scott Varady, "Are Security Deposits Taxable Income? Indianapolis Power & Light Co.," 44 Tax Law. 597 (1991); Vivian R. King, "Commissioner of Internal Revenue v. Indianapolis Power & Light Co.; Federal Income Tax Treatment of Customer Deposits by an Accrual–Basis Electric Company," 16 T. Marshall L.Rev. 355 (1991).

obligation to repay, with interest, was set at the time of overpayment. *Id.* at 1445. "The obligation to repay controls this analysis," the court concluded, and "[t]hus, the overrecoveries are not taxable income." *Id.* at 1445–46.[35]

In the court's view, *Houston Indus.* is controlling here, while *Indianapolis Power & Light* and *Iowa Southern* are distinguishable. Here, the return of overrecoveries of fuel and energy conservation costs were not within the control of PSI. The IURC (following a law passed by the Indiana legislature) and FERC imposed the FAC on PSI and other utilities to reduce the volatility of customers' bills. PSI was required by that clause to overcollect for fuel costs in certain months and almost immediately became liable to return those funds by setoff on customers' bills in the later months of the recovery period in order to create level pricing. It could not change or alter the time or method of refunding the overrecoveries, which, therefore, necessarily sometimes bridged taxable years. As such, because the time and method of refunding overrecoveries was controlled by the Regulatory Authorities, rather than by PSI, and because the FAC adopted by the Regulatory Authorities required monthly reconciliations, the utility did not have "complete dominion" over the overrecoveries and thus was not required to recognize them as income when received. In this court's view, this conclusion is unaffected by the fact that PSI did not segregate the overrecoveries and had unrestricted use of them, as the Supreme Court made clear that such an interim use is not determinative. *Indianapolis Power & Light*, 493 U.S. at 209, 110 S.Ct. 589. Relatedly, that PSI was not required to pay interest also does not change the result here given the relatively short period between the time an overpayment was determined and refunded, and that PSI received no interest on underpayments.

Seeking to blunt the force of this reasoning, defendant claims that PSI should not be allowed to exclude its monthly overrecoveries from taxable income because, at the time they were received, it was far from certain that PSI would have to reduce its future rates to account for those overrecoveries. Rather, since monthly overrecoveries could be offset by subsequent monthly underrecoveries, defendant maintains that it was not preordained that a particular overrecovery would actually be refunded. But, a little digging reveals that this is a cut-and-paste argument and, to boot, one with a checkered past. For all intents and purposes, defendant made the same argument in *Houston Indus.*, which the Federal Circuit described in its opinion in the following reminiscent terms—

> On appeal, the Government argues that the overrecoveries are income because HL & P's obligation to repay was contingent on no underrecoveries to balance the fuel costs before a reconciliation order. Underrecoveries might off-set overrecoveries. Because the end of the tax year does not correspond with reconciliation periods, HL & P cannot ascertain with any certainty the amount of overpayments it may be required to refund when the reconciliation occurs. Therefore, the Government contends these overrecoveries are income at the end of the taxable year.

*Id.* at 1444. That court, however, rejected this assertion in finding instead that "[b]ecause HL & P received these overrecoveries contingent upon a statutory obligation of repayment," it "acted in a custodial role." *Id.* at 1446. Immediately before that, this court also rejected the same contention, opining that "[t]he mere possibility that a debtor will have its obligation extinguished in the future by an offsetting debt of its creditor does not make the initial obligation contingent." *Houston Indus.*, 32 Fed.Cl. at 210. Based both on precedent and logic, the court finds that the same conclusion obtains here. *See*

---

35. *See also Illinois Power Co. v. Comm'r*, 792 F.2d 683, 688–90 (7th Cir.1986) (utility which held surcharge while regulatory authority decided what to do with the funds did not have taxable income); *Mutual Telephone Co. v. United States*, 204 F.2d 160, 161–62 (9th Cir.1953) (phone company surcharge received burdened with restrictions on disposition held not taxable income); *Electric Energy, Inc. v. United States*, 13 Cl.Ct. 644, 650 (1987) (surcharge received by electric utility not income where obligated to pay surcharge to sponsoring companies).

*also Florida Progress,* 114 T.C. at 597, 600 (rejecting a similar argument).[36]

In a last ditch effort to seize the day, defendant somewhat amorphously argues that PSI should not be allowed to exclude its monthly fuel cost overrecoveries because it did not include its underrecoveries in income until they actually resulted in an increase in PSI's rates. Defendant, however, cites no authority for this proposition, leaving the court to speculate as to its statutory foundation. It may be that defendant is invoking, *sub silentio,* the requirements of section 446 of the Code. Section 446(a) requires that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." 26 U.S.C. § 446(a). Section 446(b) then indicates that "if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary [of the Treasury], does clearly reflect income." 26 U.S.C. § 446(b). However, any reliance on these provisions here seemingly would be misplaced because; (i) on this count, its appears that PSI computed its taxable income using its book accounting method; (ii) neither the Secretary of the Treasury nor his delegate has ever determined that this method did not clearly reflect income; (iii) section 446 generally does not deal with whether a particular item (*e.g.,* the overrecoveries) is reportable as income; and (iv) clear reflection principles might simply require underrecoveries to be reported earlier, an issue that is not before the court and potentially involves different facts.[37] *See Fla. Progress,* 114 T.C. at 603–04. Accordingly, defendant's *ad hoc* attempt

to inject "clear reflection" principles into this case is unavailing.

## C. Asbestos Encapsulation and Removal

Finally, turning onto the home stretch, the third and final issue for the court to resolve is whether PSI is entitled to deduct the amount it paid for removing and encapsulating at one of its buildings certain deteriorating fireproofing material that contained asbestos fibers. Plaintiff contends that such expenses were deductible as ordinary and necessary business expenses under section 162 of the Code, while, contrariwise, defendant argues that the same expenses were capital in nature and thus nondeductible.

The record shows that the building's original fireproofing material, which contained asbestos, was sprayed onto various parts of the steel structure and did not create a problem for years. As that material deteriorated, however, the danger of the asbestos circulating in the offices increased. PSI decided to remove or encapsulate the asbestos in order to restore the building's fireproofing to a state where it would not crumble or cause asbestos to be circulated. The contractor removed and encapsulated asbestos on the basement and first floor of the 1972 addition, and encapsulated asbestos on the second floor. The nature of the improvement was such to allow PSI to continue to use the building for its offices, and not to create a new or different use. PSI used the building as an office building from the time of its construction to the date of the asbestos removal, and continued to use it as an office building after the work was performed. The improvements were made to keep this office building in effective operating condition, and

---

**36.** Defendant's position on this point is just a tough schizophrenic for while in the context of its section 1341 arguments, it insists on strict application of the annual accounting principle, here it seemingly ask the court to take into account events (*i.e.,* the generation of an offsetting underrecovery) that, at least in some instances, occurred after the taxable year in question. Indeed, while defendant attempts to distinguish *Houston Indus.,* this court believes that the facts here are actually stronger for plaintiff because PSI's obligation to repay overrecoveries was more fixed. Its FAC required reconciliation through a set formula on a specified schedule.

By comparison, the reconciliation in *Houston Indus.* was irregular and could occur, at the utility's discretion, as many as 12 months after a utility implemented a change in its base rates.

**37.** Plaintiff, for example, alleges that it was not entitled to recoup underrecoveries unless it met a raft of additional conditions that did not apply to overrecoveries, such as demonstrating that: (i) it acquired fuel during the underrecovery period at the lowest cost reasonably possible; and (ii) its excess fuel costs were not offset by savings or decreases in other operating expenses.

not to put the building into operating condition or to qualify it for a new and different use.

Section 162(a) of the Code allows for the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a). In contrast, section 263 disallows deduction for a capital expenditure, which is "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." *Id.* at § 263(a)(1). "The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery," the Supreme Court has stated, for "[w]hile business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset...." *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 83–84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992). The Supreme Court in *INDOPCO* likewise made clear that deductions are the exception to the norm of capitalization. *Id.* at 84, 112 S.Ct. 1039.[38]

■■■■ In order to qualify for a deduction under section 162(a), "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *Comm'r v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). The term "necessary" imposes only the minimal requirement that the expense be " 'appropriate and helpful' for 'the development of the [taxpayer's] business.' " *Comm'r v. Tellier*, 383 U.S. 687, 689, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966) (alteration in the original) (quoting *Welch v. Helvering*, 290 U.S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212 (1933)). An "ordinary" expense must be related to a transaction "of common or frequent occurrence in the type of business involved." *Deputy v. du Pont*, 308 U.S. 488, 495, 60

S.Ct. 363, 84 L.Ed. 416 (1940) (citation omitted).

■■■■ Determining whether a payment is a business expense or capital expenditure is a fact intensive inquiry. *See Jones v. Commissioner*, 242 F.2d 616, 620 (5th Cir.1957) ("There is not and probably cannot be any exact definition of the term 'ordinary and necessary' and each case must be determined on the basis of its own facts and circumstances."). The Treasury regulations supply some of the relevant criteria. They indicate, for example, that no deductions are allowed for amounts expended to "(1) add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use." 26 C.F.R. § 1.263(a)–1(b). Under the regulations, however, the costs of incidental repairs are typically deductible:

> The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense .... Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept.

26 C.F.R. § 1.162–4; *see also Smith v. Comm'r*, 300 F.3d 1023, 1028–29 (9th Cir. 2002); Mertens § 25:69.50. The adjectives in these regulations—"substantially," "materially," and "appreciably"—are all important, as it is well-accepted that any repair confers some measure of positive value to the property repaired; in consequence, the addition of such minimal value is not disqualifying. *See, e.g., Plainfield–Union Water Co. v. Comm'r*, 39 T.C. 333, 338, 1962 WL 1262 (1962).

**38.** "If an expense were to fall under the language of section 263(a), that section would 'trump' the deductibility provision of section 162(a) and the expense would have to be capitalized. Thus, in order to be deductible, the expense must both be 'ordinary and necessary' within the meaning of section 162(a) and fall outside the group of capital expenditures envisioned by section 263(a)." *PNC Bancorp, Inc. v. Comm'r*, 212 F.3d 822, 827 (3d Cir.2000) (emphasis omitted); *see also United Dairy Farmers, Inc. v. United States*, 267 F.3d 510, 516 (6th Cir.2001).

Courts construing these regulations have crafted helpful formulae for distinguishing between deductible repairs and nondeductible capital improvements. In *Plainfield–Union Water Co.*, for example, the Tax Court opined that "[a]n expenditure which returns property to the state it was in before the situation prompting the expenditure arose, and which does not make the relevant property more valuable, more useful, or longer lived, is usually deemed a deductible repair." 39 T.C. at 337. Under this standard, any increased value associated with a remediation thus is "determined by comparing the value of an asset after the expenditure with its value before the condition necessitating the expenditure." Mertens, § 25:69.50. Yet another formulation is the so-called "put and keep" approach, explained by the Ninth Circuit as follows:

> The test which normally is applied is that if the improvements were made to "put" the particular capital asset in efficient operating condition, then they are capital in nature. If, however, they were made merely to "keep" the asset in efficient operating condition, then they are repairs and deductible.

*Moss v. Comm'r*, 831 F.2d 833, 835 (9th Cir.1987) (quoting *Estate of Walling v. Comm'r*, 373 F.2d 190, 192–93 (3d Cir.1967)); *see also Norwest Corp. v. Comm'r*, 108 T.C. 265, 279, 1997 WL 203700 (1997) (summarizing these various standards).

In the instant case, the expenditures attributable to the removal and encapsulation of the asbestos in the 1972 addition did not appreciably increased the value of PSI's property, instead only restoring value to the property that existed prior to the asbestos becoming friable. Moreover, such expenditures represented only a small fraction of the overall value of the building. The expenditures also neither substantially prolonged the building's useful life, nor adapted the property to a new or different use. As such, it appears that the expenses in question are currently deductible.

In these regards, this case is analogous to *Chicago, Burlington & Quincy R.R. v. United States*, 197 Ct.Cl. 264, 455 F.2d 993 (1972), *rev'd on other grounds*, 412 U.S. 401, 93 S.Ct.

2169, 37 L.Ed.2d 30 (1973). In that case, in 1955, the plaintiff railroad carried out 28 construction projects, costing $121,026.70, directed to protecting and maintaining its rail embankments near waterways. The work included channel diversions; the construction of dikes, dams and jetties; bridge grade raising; riprap construction and bridge and culvert modifications. These projects were part of a continuous program to evaluate the embankments and take the steps necessary to prevent their erosion—"[w]hen necessary to correct deterioration, the steps taken are intended to arrest the problem and prevent a premature end to the service life of the embankment." 455 F.2d at 1014. Applying standards like those described above, the Court of Claims concluded that the costs of these projects were currently deductible. In this regard, it found—

> The record here supports plaintiff. The construction work, though differing in detail from project to project, all was undertaken as remedial steps to correct problems of water erosion which threatened to render unserviceable already existing railroad embankments, some of which had been in place for as long as 60 years. The value and original service life of the embankments were not increased by the corrective work done; nor were the embankments adapted to any new or different use..... Rather, the work simply arrested and corrected a condition of deterioration which threatened a premature end to the otherwise indefinite service life of the embankments.... The fact that some of the construction work may have been relatively permanent and had a useful life of more than one year is not controlling ... Nor is it controlling that the work restored the embankments to their pre-erosion condition and added value as compared with the situation immediately prior to the work.

455 F.2d at 1015. The court further noted that "plaintiff's embankments were constructed originally under sound engineering practices to protect against waterflow as it then existed," noting that it thus was not possible to foresee the need for the change at the time the embankments were originally constructed. *Id.* at 1016. "In sum," it con-

cluded, "the construction projects were in the nature of repairs and maintenance, rather than capital improvements, and their cost is currently deductible." *Id.* at 1018.

PSI's case fits comfortably within the contours established in *Chicago, Burlington.* As in that case, the work undertaken here was designed to correct a problem—the fraying of the asbestos fire-proofing which threatened to render unserviceable PSI's office building. The value and original service life of the building was not increased by the corrective work, nor was the building adapted to any new or different use. Rather, "the work simply arrested and corrected a condition of deterioration which threatened a premature end" to the service of the building. Indeed, while, in this area, each case must rest upon its facts, it is notable the Court of Claims, the Tax Court and other courts have all repeatedly concluded that the cost of work performed to correct deterioration that was not originally foreseeable is currently deductible, provided it does not increase the value or useful life of the asset as compared to prior to its deterioration. *See Niagara Mohawk Power Corp. v. United States,* 214 Ct. Cl. 686, 558 F.2d 1379, 1387–88 (1977) (per curiam) (natural gas company entitled to deduct currently costs of repairing leaks in iron pipelines); *Connecticut Light & Power Co. v. United States,* 156 Ct.Cl. 304, 299 F.2d 259, 265 (1962) (natural gas company entitled to deduct currently costs of converting customer appliances); *Kansas City Southern R.R. v. United States,* 125 Ct.Cl. 287, 112 F.Supp. 164, 165–66 (1953) (railroad entitled to deduct pole driving work designed to eliminate the threat of subsidence caused by water pockets that had developed under its tracks); *Plainfield–Union,* 39 T.C. at 337 (water company entitled to deduct cost of remedying tuberculation in pipes by installing cement lining).[39]

Contrary to defendant's claim, this case is yet again distinguishable from *Dominion,* where the court found that the costs of removal of asbestos-containing materials, sludge, and assorted contaminants from a power plant should be capitalized. There such expenses were incurred to convert the power plant into property suitable for an entirely new use, as a real estate development. Focusing on the nature of the improvements, the Fourth Circuit, describing its standard for distinguishing between *ordinary vs. capital* expenditures, stated—

> [i]f the improvement permits the property to be utilized in a different way, the improvement is most appropriately considered a capital expenditure. If the improvement only restores value to the property that existed prior to deterioration or to a discrete event that damaged the property, the improvement may be properly treated as a deductible repair expense.

219 F.3d at 371. Applying this test, the court held that the environmental cleanup of the power plant was a capital expenditure because it substantially altered the character of the property, "lift[ing] the property out of

---

**39.** Among the other Tax Court decisions that support the conclusion reached herein is *Illinois Merchants Trust Co.,* 4 B.T.A. 103, 1926 WL 308 (1926). There the Board of Tax Appeals (the Tax Court's predecessor) considered whether the cost of repairing rotting support pilings in a warehouse was deductible as an ordinary expense. The taxpayer in that case leased a warehouse located on the Chicago River; when the river unexpectedly receded, the pilings which supported the warehouse were exposed to the elements and developed dry rot. The taxpayer removed the dry rot and inserted cement supports between the piles and floor of the building. It also removed large parts of the ground floor and shored up and raised the partially collapsed wall. The BTA held that these costs were deductible because they were incurred to prevent the total loss of the building and to keep the property in its ordinary operating condition as a warehouse. To similar effect, *see Oberman Manufacturing Co. v. Comm'r,* 47 T.C. 471, 1967 WL 1017 (1967) (holding that replacing the expansion joint and replacing original roofing materials were deductible repair expenses performed to repair the leaking roof and keep it in a good operating condition); *Midland Empire Packing Co. v. Comm'r,* 14 T.C. 635, 641, 1950 WL 172 (1950) (holding that cost of adding concrete lining to walls in order to prevent seepage of oil into taxpayer's basement was deductible repair expense); *Libby & Blouin, Ltd. v. Comm'r,* 4 B.T.A. 910, 1926 WL 536 (1926) (holding that cost for replacing copper tubes in a sugar refining machine was deductible repair expense); *see also Regenstein v. Edwards,* 121 F.Supp. 952 (M.D.Ga.1954) (holding that the cost of installing temporary steps, steel columns and steel crossbeams were deductible repair expenses necessary to return the property to its original condition). *See generally,* Susan C. Duffy, "Asbestos Removal Costs May Be Currently Deductible," 70 J. Tax'n 290 (1989).

what was essentially a condition of uselessness" to one with a wide range of new uses. *Id.* at 372; *see also Jones v. Comm'r*, 242 F.2d 616, 620 (5th Cir.1957) (sums expended to make building habitable held capital). The court also noted that the remediation was unrelated to any deterioration of the asbestos and that the cleanup costs of $2.2 million "dwarfed the value of the property," which was acquired for $870,167. 219 F.3d at 371. On all of these counts, the case *sub judice* is fundamentally different, described not by the first category of capital expenditures identified by the Fourth Circuit in its test, but rather by the second, *to wit,* one where "the improvement only restores value to the property that existed prior to deterioration."

*Sui generis,* likewise, is *United Dairy Farmers, Inc.,* where the court held that soil remediation costs were not deductible. There, the taxpayer purchased two stores that contained underground gasoline storage tanks left by prior occupants. On both properties, the tanks had leaked, causing soil contamination; the taxpayer was aware of this prior to closing the purchases. In discussing whether the remediation costs were deductible, the Sixth Circuit, attempting to "harmonize[d] in a coherent framework" the various *"ordinary vs. capital"* decisions, opined—

> That is, three elements must be satisfied for a valid deduction under § 162 for environmental cleanup costs: first, the taxpayer contaminated the property in its ordinary course of business; second, the taxpayer cleaned up the contamination to restore the property to its pre-contamination state; third, the cleanup did not allow the taxpayer to put the property to a new use.

*United Dairy Farmers,* 267 F.3d at 519. It held that the first of these requirements had not been met because the taxpayer had acquired the property with the soil already contaminated by leaking gasoline tanks. By comparison, here, the need for removing and encapsulating the asbestos arose not from contamination that existed at the time the building was constructed in 1972, but because the asbestos became friable over time during the ordinary operation of the office building. As such, the case *sub judice* is not one in which "a taxpayer improves property defects that were present when the taxpayer acquired the property," 267 F.3d at 518, but one in which the contamination occurred over time, causing a health problem that was not anticipated at the time of construction.

A few words of additional elaboration are in order. Defendant seems to rely on *United Dairy, Dominion* and other cases to argue that if a company acquires property with a flaw or frailty that, over time, deteriorates into a full-blown problem, the cost of remediation must be capitalized. But this premise simply cannot be reconciled with the many cases discussed above, all of which involved situations in which property constructed or purchased by the taxpayer had, at the time of construction or purchase, a potential defect that eventually required repairs. In *Chicago Burlington,* it was embankments subjected to erosion; in *Mohawk,* iron pipes that corroded and sprung leaks; in *Kansas City Southern,* a railbed that was undermined by water; in *Illinois Merchants Trust,* pilings that developed dry rot—and here, it was asbestos fireproofing that became friable over time by exposure to air. Nor is this case different because the asbestos here presented a potential health risk to PSI's employees—undoubtedly, many of the conditions remedied in the other cases also posed risks to the employees of the firms involved, yet there is not the slightest indication that this entered into the calculus of those decisions. And there is absolutely no indication that it should.[40] Moreover, the remediation efforts to address the asbestos problem could neither have been anticipated by PSI in the original design of the building, nor were they remedied as part of a generalized plan of rehabilitation and renovation.

---

**40.** Notably, the relevant Treasury Regulations require capitalization where a cost materially adds value or prolongs the useful life of the taxpayer's "property"—the latter reference certainly does not refer to the taxpayer's employees. At all events, the record is inhospitable to the notion that the mere presence of asbestos devalued the 1972 addition, so that its removal or encapsulation, apart from remedying the friction problem, somehow significantly increased the value of the building as a whole.

**520**

*Cf. Norwest Corp. & Subs. v. Comm'r*, 108 T.C. 265, 282–86, 1997 WL 203700 (1997).[41] As such, the removal and encapsulation costs were currently deductible under section 162, as "ordinary" and necessary expenses of PSI's trade or business.[42]

## III. CONCLUSION

While Justice Cardozo once said that "[t]he law, like a traveler, must be ready for tomorrow," this court, on this day, need go no further. Based upon its careful review of the record and the law, the court finds:

1. PSI is not entitled to compute its income tax liability for 1988 and 1989 in accordance with the "claim of right" provisions of section 1341 of the Code;

2. PSI may exclude from its taxable income for the years in question fuel cost overrecoveries that it was obligated to return to its customers pursuant to orders of the Regulatory Authorities; and

3. PSI was entitled to deduct, under section 162 of the Code, the cost of removing and encapsulating asbestos material in one of its office buildings in Plainfield, Indiana.

Pursuant to discussion previously held with the parties:

1. By April 18, 2003, the parties shall file a document or documents showing the correct amount of the judgment that should be entered herein consistent with this court's determinations.

2. If the parties agree as to that amount, they shall file by that date a single document including the computation and certifying that the parties agree that the figures reflected therein are in accordance with the finding and conclusions of the court.

3. If, however, the parties disagree as to that amount, they shall each file by that date, a document reflecting their view of the judgment that should be entered herein and the reasons therefor. Then, by May 1, 2003, each party shall file a response to the other's computation.

**IT IS SO ORDERED.**

---

41. To be sure, at various points in the building, the removal of asbestos was followed by the installation of new fire-proofing material or a sprinkler system. The record, however, indicates that the latter steps flowed, both causally and chronologically, from the need to replace the fireproofing capacity of the asbestos and were not part of a broader plan of rehabilitation.

42. As noted earlier, this court does not reach the issue whether the $45,000 expended by PSI for non-asbestos replacement fireproofing was deductible, that issue, in the court's view, having been waived by plaintiff due to its failure to raise it on a timely basis.